# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

**CHAPTER 11**

**CASE NO.: 6:10-bk-03322-KSJ**

**HUDSON'S FURNITURE**
**SHOWROOM, INC., *et.al.***

**Jointly Administered with Case Nos.**
**6:10-bk-3543 thru 6:10-bk-3549**

Debtors.

_____/

# AMENDED JOINT DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. §1125 FOR HUDSON'S FURNITURE SHOWROOM, INC., *ET AL.*

COUNSEL FOR DEBTORS

R. SCOTT SHUKER, ESQ.
VICTORIA KOTHARI, ESQ.
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
390 N. ORANGE AVENUE, SUITE 600
ORLANDO, FLORIDA, 32801

September 24, 2010

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                    **CHAPTER 11**

**HUDSON'S FURNITURE**                    **CASE NO.: 6:10-bk-03322-KSJ**
**SHOWROOM, INC.**, *et.al.*

                                          **Jointly Administered with Case Nos.**
                        Debtors.          **6:10-bk-3543 thru 6:10-bk-3549**
_____/

## AMENDED JOINT DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. §1125 FOR HUDSON'S FURNITURE SHOWROOM, INC., *ET AL.*

### I.    INTRODUCTION AND SUMMARY

This Amended Joint Disclosure Statement ("Disclosure Statement") is filed pursuant to the requirements of §1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned bankruptcy cases ("Bankruptcy Cases") to make informed judgments about the Joint Plan of Reorganization (the "Plan") submitted by Hudson's Furniture Showroom, Inc. ("HFS"), and seven (7) of its affiliated or related debtors and debtors-in-possession as set forth in **Exhibit "A"** (collectively, HFS and certain affiliates and related entities listed on Exhibit "A" hereafter referred to as "Debtors"). The Debtors are soliciting votes to accept the Plan. The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtors believe that the Plan provides the best means currently available for their emergence from Chapter 11 and the best recoveries possible for holders of claims and interests against the Debtors, and thus strongly recommend that you vote to accept the Plan.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES**

TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTORS IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE WHICH ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTORS' BUSINESSES AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTORS' CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

THE PLAN PROVIDES FOR INJUNCTIVE RELIEF TO PROTECT A CERTAIN PARTY WHO IS (1) PROVIDING CONSIDERATION TO THE ESTATES AND REORGANIZED DEBTOR, (2) SUBSTANTIALLY COMPROMISING THEIR CLAIMS, AND (3) CRITICAL TO THE EXECUTION OF THE REORGANIZATION PLAN DETAILED HEREIN. THE PERSON SO PROTECTED, AND THE SCOPE OF THE INJUNCTION, IS DEFINED IN ARTICLE VIII OF THE PLAN AND ARTICLE V HEREOF. IF THE PLAN IS CONFIRMED THE PERSON SPECIFIED IN THESE PROVISIONS OF THE PLAN WILL NOT BE RELEASED FROM THE CLAIMS OF THE DEBTORS AND ANY CREDITOR AND PARTY IN INTEREST IN THESE CASES.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

HFS is a debtor under Chapter 11 of the Code in a bankruptcy case pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court"). In addition to HFS, as of Petition Date, there were seven (7) affiliated and related companies which also filed petitions for relief under Chapter 11 of the Code.[1] An organizational chart is available upon request.

As prescribed by the Code and the Rules, Claims asserted against, and equity Interests in, the Debtors are placed into "Classes". The Plan contemplates the merger of the Chapter 11 Bankruptcy Cases of the Hud Affiliates into HFS, as further detailed in the Plan. Accordingly, the Plan designates twenty (20) separate classes of Claims and Interests, which Classes are comprised of: eleven (11) Classes of Allowed Secured Claims; one (1) Class of Unsecured Claims; and eight (8) Classes of Interests. Pursuant to the Plan, on the Effective Date: (i) all assets and all proceeds

---

[1] In 2009, four affiliated and related companies filed petitions for relief under Chapter 11 of the Code and are being jointly administered under Case No.: 6:09-bk-15479-KSJ - *In re Hud-Five, LLC. et al.*, (collectively, the "Hud-5 Debtors"). The Hud-5 Debtors have filed their own Plan of Reorganization and are not dealt with herein.

thereof, and all liabilities of the Debtors will be treated as though the assets and liabilities were, and shall be, merged into HFS ( the "Reorganized Debtor"); (ii) all Allowed Claims and Claims by and among the Debtors (the "Intercompany Claims") will receive no distribution under the Plan; (iii) any obligation of any Debtor, and all guarantees thereof executed by one or more of the Debtors, and any Claims in a case of a proponent hereof, filed or to be filed in connection with any such obligation and guarantee will be deemed one Claim against the respective Debtor; (iv) each and every Claim filed in the individual Chapter 11 Case of any of the Debtors will be deemed filed against the Reorganized Debtor; and (v) for purposes of determining the availability of the right of set-off under Section 553 of the Bankruptcy Code, the Reorganized Debtor shall be treated for purposes of the Plan as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any of the respective Debtors may be setoff against the debts of any of the Reorganized Debtor; provided, however nothing herein shall be deemed to create a right of set-off and any party asserting such must have timely filed a secured claim. The classification of Claims and the treatment of each Class is discussed in detail below.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired", and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan ("Ballot") will be mailed along with the order approving this Disclosure Statement.

> **THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE <u>RECEIVED</u> AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

**VOTING DEADLINE**

The last day to vote to accept or reject the Plan is October 21, 2010. All votes must be received by the voting agent by 5:00 p.m. (EST) on that day.

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether Debtors have complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, Debtors have expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II.    DESCRIPTION OF DEBTORS' BUSINESSES

A.    In General.

Hudson's Furniture Showroom, Inc., a Florida corporation ("HFS"), was incorporated on September 8, 1982. Each of the seven (7) affiliated or related entities that also filed for Chapter 11 bankruptcy protection on or about March 3, 2010 are single member, single purpose Florida limited liability companies (the "Hud Affiliates") (collectively with HFS, the "Debtors"). The Hud Affiliates were formed on the following dates:

| DEBTOR | DATE OF FORMATION |
|---|---|
| Hud-One, LLC | June 28, 2004 |

| Hud-Three, LLC | November 12, 2004 |
| --- | --- |
| Hud-Six, LLC | December 29, 2004 |
| Hud-Ten, LLC | August 2, 2005 |
| Hud-Twenty-Two, LLC | November 15, 2005 |
| Hud-Twenty Four 445 S. Yonge, LLC | November 21, 2007 |
| Hud-Twenty-Seven Mason, LLC | February 20, 2008 |

Since 1982, HFS has been engaged in the business of selling furniture to consumers. HFS operates a total of twelve (12) showrooms throughout central Florida. Certain Hud Affiliates own various parcels of developed commercial real estate in the central Florida area (the "Real Property"). HFS operates and conducts its business in the furniture showrooms which are located on the Real Property. Please see the attached **Exhibit "B"** for a complete description of the Debtors' commercial properties[2]. HFS delivers furniture to its customers all over Florida, as well as the Southeast United States.

As of the Petition Date, HFS is a party to oral rental agreements with each of the Hud-5 Debtors and certain Hud Affiliates listed on **Exhibit B** (collectively, the "Real Property Debtors"), pursuant to which HFS agreed to pay, in lieu of direct rent payments, each respective Real Property Debtor's allocated share of any mortgage payment due to the respective lenders, along with property taxes and related operating costs of the property.

---

2 The attached Exhibit does not include a description of the Hud-5 Debtors' commercial properties. That information is available in the Joint Disclosure Statement Pursuant to 11 U.S.C. §1125 for Hud-Five, LLC, *et al.* filed in Bankruptcy Case No.6:09-bk-15479-KSJ.

The remaining Debtor, Hud-Ten, LLC, is a holding company that owns a plane more particularly described as a 2000 Pilatus Model PC-12 (the "Plane"). The Plane is used to assist HFS with the operations and marketing of its retail furniture business.

Most of the personal property, including inventory, is owned by HFS. Most, if not all, of the revenue is generated by HFS through retail furniture sales. For the calendar year ending December 31, 2009, the gross revenue for HFS was $41,162,377.40. As of the Petition Date, HFS employed 156 people. The Hud Affiliates have no employees.

B.    Significant Developments and Events Leading to Chapter 11 Filing.

Collectively, the general decline in the economy along with high unemployment and foreclosure rates has had a significant negative impact on the operations of HFS through decreased furniture sales and on the value of the Hud Affiliates underlying real property. In the six (6) months prior to the Petition Date, and due largely to the decrease in sales, HFS has had difficulty servicing its debt, including, but not limited to, rent payments to the Real Property Debtors. As a result, the Real Property Debtors have fallen behind in paying their mortgages. Due to such circumstances, four related entities filed for Chapter 11 relief on October 13, 2009, and such cases are pending before this Court.[3] Ultimately, the Debtors determined that it was in the best interests of all parties for them to seek reorganization under Chapter 11, as well.

C.    Events Subsequent to Chapter 11 Filing.

Since the Petition Date, the Debtors have continued to operate their businesses as debtors-in-possession under Sections 1107(a) and 1108 of the Code. Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") the Debtors sought and obtained an order from

the Bankruptcy Court authorizing the joint administration of the Debtors respective Chapter 11 cases. (HFS, Doc No. 41). The Debtors also sought and obtained an order, pursuant to Section 327 of the Code, from the Bankruptcy Court authorizing the Debtors to retain Latham, Shuker, Eden & Beaudine, LLP as Debtors' counsel. (HFS, Doc No. 76). On April 2, 2010, the Court granted an order approving the Debtors' application to employ/retain Terry J. Soifer and Consulting CFO, Inc., as a Financial Advisor *nunc pro tunc* to March 3, 2010. (HFS, Doc. No. 70). On April 14, 2010, the Bankruptcy Court entered an order giving HFS the authority to honor prepetition deposits and cancelations. (HFS, Doc. No. 86).

On February 17, 2010, Compass Bank ("Compass") filed a motion for Relief from Stay requesting relief from the Automatic Stay under § 362(d) of the Bankruptcy Code to foreclose on certain of the Debtors' real property and to take possession of the rents and other collateral covered by its alleged blanket lien on all of HFS' assets. (HFS, Doc. No. 32). On April 8, 2010, the Court entered an order directing Compass and HFS to mediation. (HFS, Doc. No. 79). Although the mediation resulted in a settlement agreement (the "Settlement Agreement") (HFS, Doc. No. 134), Compass subsequently unilaterally withdrew its concurrence with the Settlement Agreement and on June 23, 2010, the Court denied Compass' motion for Relief from Stay. (HFS, Doc. No. 156).

On March 23, 2010, Regions Bank ("Regions") filed its Motion for Relief from Stay, or in the Alternative, for Adequate Protection as to Debtor, HUD-Six, LLC ("HUD-6"). (HFS, Doc. No. 50). On May 21, 2010, the Court issued an Order granting this Motion, in part, directing HFS to pay to Regions $50,000 per month as adequate protection from June 1 through November 1, 2010 and authorizing Regions to be entitled to its Relief from Stay if HFS defaulted. (HFS, Doc. No. 129).

---

3 *Supra*, n.1. Those four related entities are: Hud-Five, LLC; Hud-Twenty-Three Tampa, LLC; Hud-Twenty-Five

Regions and HUD-6 subsequently obtained an order granting their agreed motion to determine HUD-6 is a single asset real estate case, pursuant to 11 U.S.C. § 101(51B), and imposing the requirements of 11 U.S.C. § 362(d)(3). (HFS, Doc. No. 125).

On May 3, 2010, Florida Capital Bank ("Florida Capital") filed its Motion for Relief from Stay regarding property on Colonial Drive (HFS, Doc. No. 97) and its Motion for Relief from Stay regarding property in Altamonte (HFS, Doc. No. 99). Pursuant to an agreement between the Debtors and Florida Capital, the Bankruptcy Court entered orders on each motion on July 27, 2010, granting, in part, and denying, in part Florida Capital's request for relief from stay. (HFS, Doc. No.'s 194 and 195, respectively) (the "Orders"). The Orders direct HFS to pay to Florida Capital $13,000 per month with respect to each property as adequate protection from August 1 through November 1, 2010 and authorizing Florida Capital to be entitled to its Relief from Stay if HFS and failed to cure within three (3) business days after notice of default.

On May 24, 2010, creditor Valley Commercial Capital, LLC ("VCC") filed its Motion for Relief from Stay regarding the Plane (HFS, Doc. 131). On August 13, 2010 the Bankruptcy Court entered an Order Granting in Part and Denying in Part Motion For Relief From Stay. (HFS, Doc. No. 216). The Order provides, in part, (i) for HFS to make monthly adequate protection payments to VCC based on a fifteen (15) year amortization of its secured claim of $1,860,107.30 plus interest commencing on August 1, 2010; and (ii) to forbear from exercising any of its rights and/or remedies against guarantor C. Fred Hudson for so long as no default occurs.

On June 22, 2010, the Debtors filed a Motion for Approval of Adequate Protection Agreement between the Debtors and Wells Fargo Bank, N.A. ("Wells Fargo")(HFS, Doc. No. 155).

---

Ocoee, LLC; and A&J Rentals, LLC.

Only July 14, 2010 the Bankruptcy Court entered an order granting Wells Fargo's motion and providing, in part, (i) for HFS to pay to Wells Fargo $60,000 per month *nunc pro tunc* to June 15, 2010 until confirmation of the Plan; (ii) directing certain Debtors to transfer or cause to be transferred, free and clear of liens or encumbrances, the properties listed in **Exhibit "C"**; and assign all leases and other contracts producing income for the use of the Properties to Wells Fargo.(HFS, Doc. No. 185).

On June 24, 2010, creditor GE Commercial Finance Business Property Corporation ("GE") filed its Motion for Relief from Stay regarding certain real and personal property (HFS, Doc. No. 160). On July 30, 2010, GE filed its Motion to Continue/Reschedule Hearing on Motion for Relief from Automatic Stay. (HFS, Doc. No. 203). Pursuant to GE's request, the Bankruptcy Court has continued the hearing to October 28, 2010. (HFS, Doc. No. 217).

On June 30, 2010, the Debtors filed their Joint Disclosure Statement and Chapter 11 Plan of Reorganization with the Bankruptcy Court. (HFS, Doc.No.'s 169 and 170, respectively). On August 16, 2010, the Bankruptcy Court entered an Order Denying Approval of Joint Disclosure Statement. (HFS, Doc. No. 221)

On July 2, 2010, Furniture Brands International ("Broyhill") filed its Motion to Amend Final Order Authorizing Use of Cash Collateral to Include Certain Provisions Agreed Upon Between the Debtors and Broyhill. (HFS, Doc.No. 177). On August 18, 2010, the Bankruptcy Court entered and order on the motion establishing, in part, the amount and priority of Broyhill's secured interest. (HFS, Doc. No. 225).

On August 6, 2010, 7976 Properties, Inc. filed a Complaint against HFS, Hud-24 and Wells Fargo seeking to establish the validity, priority and extent of its lien. (HFS, Doc. No. 212) 1). On

September 8, 2010, HFS and Hud-24 filed their Joint Answer and Affirmative Defenses. (Adv. Pro. #: 6:10-ap-00199-KSJ, Doc.No. 9).

## III.   THE PLAN

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF DEBTORS' PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

### A.   Overview.

In summary, the Reorganized Debtor will continue to operate its remaining furniture showrooms[4] with low operating expenses. All real property shall be transferred to the Reorganized Debtor. The Reorganized Debtor shall execute new notes, mortgages, and security agreements with its secured creditors based, in part, on adjusted property values that more accurately reflect the reduced market value of the each lender's secured interest its collateral (collectively, the "New Secured Obligations"). Alternatively, at the request of lenders, the Reorganized Debtor will affirm and modify existing documents. The Debtors believe the cash flow generated from core operations along with a reduction in cash flow demands from the New Secured Obligations shall be sufficient to cover the respective Reorganized Debtor's Plan Payments.

The Allowed Secured Claims will be paid and treated as set forth below and under the Plan. Allowed Priority Claims will be paid out over time, and Allowed Unsecured Claims will be paid and treated as set forth below. The Equity Interest in HFS will be re-vested in Joshua L.

---

4 The Reorganized Debtor shall operate eight (8) furniture showrooms. The Hud-5 Debtors propose to assume operations of the four (4) showrooms located on the Hud-5 Debtors real property.

Hudson and Adam C. Hudson and the Equity Interests in all remaining Debtors shall be extinguished as of the Effective Date.

All Claims against the Debtors shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains twenty (20) Classes of Claims and Interests. There are eleven (11) Classes of Secured Claims, one (1) Class of Unsecured Claims, and eight (8) Classes of Equity Interests.

Overall, the Plan provides that Holders of Allowed Administrative Claims will be paid in full on the Effective Date. Holders of Allowed Priority Tax Claims (not secured) will receive Cash Payments over a period not to exceed five (5) years after the date of the assessment of the Claim of a value, as of the Effective Date of the Plan, equal to the Allowed Amount of the Claim. The Debtors will pay interest on such Claims at the Statutory Rate. The Debtors estimate that the filed amount of Priority Tax Claims is approximately $50,000.

The Holder of Allowed Secured Claims in Classes 1 to 11 to the extent they have Allowed Claims, will receive payment equal to one hundred percent (100%) of their Allowed Secured Claims, over time, on the terms as set forth below. All Allowed Unsecured Claims shall be classified in one unsecured class, Class 12, and shall receive a *pro rata* beneficial interest in the Cash Flow Note. The Cash Flow Note will require payments on a quarterly basis in an amount equal to seventy-five percent (75%) of the surplus over the operating budget attached hereto as **Exhibit "D"** (the "Operating Budget").

Currently issued and outstanding interests in Class 13 shall be vested in Joshua L. Hudson (50%) and Adam C. Hudson (50%). Classes 14 through 20 of Interests will be cancelled upon the Effective Date; and new equity in the Reorganized Debtor will be issued as stated herein.

13

In summary, the Plan contemplates the consolidation of the Hud Affiliates via statutory merger into HFS, which shall emerge as the sole Reorganized Debtor. The Reorganized Debtor shall continue the core operation and management of the eight (8) of the twelve (12) furniture showrooms located throughout Florida. All Classes are impaired under the Plan.

    B.    Classification and Treatment of Claims.

        1.    Priority Claims.

            a.    Administrative Expense Claims.

Holders of all Allowed Administrative Expense Claims of the Debtors shall be paid in full on the Effective Date, or, if the Claim does not become Allowed prior to the Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Bankruptcy Court. However, nothing in this provision of the Plan shall preclude Debtors, or the Reorganized Debtor, from paying any holder of a Nonordinary Course Administrative Claim less than one hundred percent (100%) of its Allowed Claim in Cash on the Effective Date provided that such Claim holder consents to different payment terms. Debtors estimate Administrative Claims to be approximately $200,000.

            b.    Priority Tax Claims.

Except to the extent that the Holder and the Debtors have agreed or may agree to a different treatment, each Holder of an Allowed Priority Tax Claim (not secured) shall be paid by the Debtors, or the Reorganized Debtor, payments equal to the Allowed Priority Tax Claim, which will be paid based on a five (5) year amortization and maturity with interest at the applicable statutory rate; the payments will be made quarterly. Payments will commence on the later

of the Effective Date or on such date as a respective Priority Tax Claim becomes Allowed. The Debtors estimate that the filed amount of Priority Tax Claims is approximately $50,000.

2. Secured Claims.

a. Class 1 – Wells Fargo Bank, N.A.

Class 1 consists of the Allowed Secured Claim of Wells Fargo Bank, N.A. ("Wells Fargo"[5]). The Claim is secured by liens on real property of the Debtors and of C. Fred Hudson, III, the C. Fred Hudson III Trust, and the Catherine J. Hudson Trust (collectively the "Wells Fargo Bank Property"),[6] described in the forbearance agreement (the "Forbearance Agreement"), as well as by guaranties of HFS, C. Fred Hudson, III and the C. Fred Hudson III Trust.

Wells Fargo is hereby deemed to have: (i) an Allowed Class 1 Secured Claim, and (ii) an Allowed Class 12 Unsecured Claim in the respective Allowed Amounts set forth below.

In full satisfaction of its Allowed Class 1 Claim:

(i)     Wells Fargo shall have received, pursuant to the Order Granting Hudson Furniture Showroom, Inc., *et al.'s* Motion for Approval of Adequate Protection Agreement with Wells Fargo Bank, N.A. (HFS, Doc. No. 185), free and clear of any liens and encumbrances except for ad valorem real property taxes, certain of the Debtors' and Hud-14, LLC's mortgaged properties, listed on **Exhibit "C"** (the "Transferred Properties"); and

---

5 F/k/a Wachovia Bank, N.A. Wells Fargo Bank N.A. is successor-by-merger to Wachovia Bank, N.A. To avoid confusion in this Disclosure Statement we shall refer to this lender as Wells Fargo.
6 As of the Petition Date, there were seven (7) separate Wells Fargo loans (the "Wells Fargo Loans") outstanding.

(ii)     Wells Fargo shall apply the value of the Transferred Properties (as of the Confirmation Date) as payment in full of Hud-One, LLC's obligation (the "Hud-1 Loan") to Wells Fargo; and

(iii)     Wells Fargo shall retain all notes and related documentation (the "Wells Fargo Notes"), guaranties, mortgages and related documentation (the "Wells Fargo Mortgages"), and liens with respect to Wells Fargo's existing loans, excepting only the Hud-1 Loan which shall be deemed satisfied by receipt of the Transferred Properties, which shall remain in place, and which terms shall remain unchanged, except as otherwise modified herein and in the Forbearance Agreement and related documentation;

(iv)     Regarding the Allowed Class 1 Secured Claim, after accounting for the Transferred Properties the Allowed Secured Claim shall be in the amount of $18,910,000.00 as adjusted by (a) and (b) below (the "Wells Fargo Obligation"):

    a.     the Allowed Secured Claim shall include certain fees and expenses, as of the Confirmation Date, incurred by Wells Fargo with respect to each of its loans, but not to exceed the amount by which Wells Fargo is oversecured as to each respective loan; and

    b.     the Allowed Secured Claim shall include post-petition interest, as of the Confirmation Date, at the applicable original contract rate, with respect to each Wells Fargo Note, but not to exceed the amount by which Wells Fargo

remains oversecured as to each respective loan after accounting for the adjustments listed in (a).

On the Effective Date and pursuant to the Plan, the Debtors and C. Fred Hudson, III and the C. Fred Hudson III Trust shall execute and deliver the Forbearance Agreement and such other agreements, instruments and documents as contemplated by that certain Term Letter dated August 10, 2010 (the "Term Letter"), or appropriate, and as Wells Fargo may request in connection with the delivery of the Forbearance Agreement provided therein, all of which shall be in form and substance satisfactory to Wells Fargo. A copy of the Forbearance Agreement and the Term Letter shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who request such. In the event of a conflict between (i) the Forbearance Agreement and all agreements contemplated by the Forbearance Agreement and (ii) the Plan, the former controls.

Pursuant to the Plan and the Forbearance Agreement, Wells Fargo shall receive for the Wells Fargo Obligation fixed monthly payments of $75,000.00 of principal and interest at the Confirmation Rate for forty-eight (48) months with a balloon payment (the "Balloon") at the end of month forty-eight (48). In the event of a default, interest shall accrue at a default rate and late fees shall apply as provided in the Forbearance Agreement. Provided there has not been a default, payments shall be applied first to accrued but unpaid interest and then to all or any of the loans comprising the Wells Fargo Loans as Wells Fargo may determine. To the extent interest in any month exceeds $75,000.00, the excess interest shall be added to the amount of the Wells Fargo Obligation and shall be due and payable at the time of the Balloon. Supplemental to the existing guaranties that will be ratified, Wells Fargo shall also receive unconditional guaranties from C. Fred Hudson, III and the C. Fred Hudson III Trust for the full amount of the Wells Fargo Obligation and a

corrective mortgage from the Catherine J. Hudson Trust for the property located at 430 S. Yonge Street, Ormond Beach, Florida. Pursuant to the Forbearance Agreement, the Reorganized Debtor, HFS, shall assume all of the Wells Fargo Loans except for the Hud-1 Loan.

Regarding the Allowed Class 12 Unsecured Claim, Wells Fargo shall receive an Allowed Unsecured Claim in the amount of $4,884,691.52 (referred to in the Term Letter as the Wells Fargo Cash Flow Note). Supplemental to the existing guaranties that will be ratified, Wells Fargo shall also receive unconditional guaranties from C. Fred Hudson, III and the C. Fred Hudson III Trust for the full amount of the Allowed Class 12 Unsecured Claim. C. Fred Hudson, III and the C. Fred Hudson III Trust shall assume joint and several liability for the balance owed for the Allowed Class 12 Unsecured Claim, if any, at the end of forty-eight (48) months after the effective date of confirmation of the Plan.

Forty-eight (48) months after the Effective Date, the Reorganized Debtor shall no longer be obligated for the Allowed Class 12 Unsecured Claim. So long as the Allowed Class 12 Unsecured Claim is outstanding during the forty-eight (48) month Plan period, the Reorganized Debtor shall operate pursuant to a the Operating Budget which shall be acceptable to Wells Fargo. If the Reorganized Debtor generates net income greater than the budgeted amount for any given quarter (the "Surplus Funds"), then 75% of the Surplus Funds shall be apportioned and paid to the Holders of Allowed Claims, including Wells Fargo, on a *pro rata* basis. All remaining Surplus Funds shall be retained by the Reorganized Debtor as a cash reserve (the "Cash Reserve") and shall not be distributed in any manner, including for any dividends to equity. The Cash Reserve shall be used only for the purpose of making Plan Payments during any quarter where net proceeds are insufficient to enable the Reorganized Debtors to make such payments. At the end of forty-eight (48) months

after the Effective Date, any outstanding amounts remaining with respect to the Allowed Class 12 Unsecured Claim shall be added to the Wells Fargo Obligation (the "Cash Flow Note Rollover"), and continue to be secured by all mortgaged properties, in form and substance satisfactory to Wells Fargo. The Balloon regarding the Wells Fargo Obligation shall include (i) all principal, interest, and fees outstanding under the Plan for the Wells Fargo Obligation and (ii) the Cash Flow Note Rollover amount, if any. If the Balloon is paid on these terms in month forty-eight (48), Wells Fargo release all Wells Fargo Mortgages; provided, however, if the Release Price (defined below) is paid prior to the Balloon as noted *supra*, the Cash Flow Note Rollover will not become due with such satisfied as set forth in Class 12.

Wells Fargo shall forbear from exercising any of its rights and/or remedies against C. Fred Hudson III and/or the C. Fred Hudson III Trust so long as no default occurs and as further articulated in the Forbearance Agreement and subject to the conditions and limitations provided therein.

There will be no release or modification of the Wells Fargo Loans and the Reorganized Debtor, C. Fred Hudson, III and the C. Fred Hudson III Trust shall continue to comply with the requirements of the loan documents for the Wells Fargo Loans. In that regard:

(i)     the Reorganized Debtor shall remain current on all taxes, subject to challenges by the Debtors for market conditions and taxing authority's property valuation;

(ii)    the Reorganized Debtor shall remain current on all appropriate insurance policies to the extent obligated, list Wells Fargo as a loss payee, and provide proof of the same to Wells Fargo;

(iii)   the Reorganized Debtor, the Debtors, C. Fred Hudson III and the C. Fred Hudson III Trust shall represent and warrant that no other secured creditors are receiving payments of assets or other items of value of any kind outside of the Plan from any of the Debtors, C. Fred Hudson, III and the C. Fred Hudson III Trust or their respective affiliates and/or entities in which they have a direct or indirect ownership interest. A separate affidavit to this effect shall be executed by the Reorganized Debtor, the Debtors, C. Fred Hudson, III and the C. Fred Hudson III Trust;

(iv)   the Reorganized Debtor, the Debtors, C. Fred Hudson, III and the C. Fred Hudson III Trust shall agree that any applicable statutes of limitations with respect to any claims that Wells Fargo has or may have as to the Debtors, C. Fred Hudson, III or the C. Fred Hudson III Trust shall be tolled effective as of the date of payment defaults on the Wells Fargo Notes;

(v)   the Debtors, C. Fred Hudson, III and the C. Fred Hudson III Trust shall provide, within seven (7) days of the request of Wells Fargo, all documentation and information (including financial statements, tax returns, etc.) necessary for Wells Fargo to evaluate (i) the financial condition of the Reorganized Debtor, the Debtors, C. Fred Hudson, III and the C. Fred Hudson III Trust, and (ii) the Reorganized Debtor's, the Debtors', C. Fred Hudson, III's and the C. Fred Hudson III Trust's overall financial structure and credit worthiness. In the event the documents are voluminous, this

obligation may be satisfied by making the documents available for inspection and copying at a location acceptable to Wells Fargo;

(vi) for a period of four and a half years from the date of confirmation of the Plan, C. Fred Hudson, III and the C. Fred Hudson III Trust shall not engage in any transaction or other activity or conduct that results or may result in a material adverse change in financial condition which include, but are not limited to, transfers of any assets outside of the ordinary course of business by C. Fred Hudson, III and/or the C. Fred Hudson III Trust or any entity which C. Fred Hudson, III and/or the C. Fred Hudson III Trust directly or indirectly controls without the prior approval of Wells Fargo; and

(vii) the Reorganized Debtor, the Debtors, C. Fred Hudson, III and the C. Fred Hudson III Trust shall provide Wells Fargo with a general release as of the Effective Date of the Plan.

The Reorganized Debtor shall have an option to refinance the Wells Fargo Notes, in full, at any time prior to the end of forty-eight (48) months after the Effective Date and subject to, in part, the following terms and conditions set forth herein and as further articulated in the Forbearance Agreement:

(i) the Reorganized Debtor shall pay Wells Fargo a refinance option release price (the "Release Price") which shall equal the greater of (a) $15,600,000.00 or (b) eighty percent (80%) of the collective net value (the "Collective Net Value") of all properties subject to the Wells Fargo

Mortgages. The Collective Net Value shall be based on appraisals deemed acceptable to Wells Fargo in its sole discretion;

(ii)     Wells Fargo shall release the Wells Fargo Mortgages upon delivery of funds equal to the Release Price;

(iii)    after delivery of the Release Price, the Reorganized Debtor shall execute a new note (the "New Note") and related documentation upon terms acceptable to Wells Fargo to evidence any excess amounts owed to Wells Fargo on the Allowed Class 1 Claim above the Release Price on the Wells Fargo Obligation (the "Remaining Debt"). The New Note shall be payable by the Reorganized Debtor and shall be amortized over a period of ten (10) years with one hundred and twenty (120) even monthly payments of principal and shall require monthly interest payments at the Confirmation Rate;

(iv)    as security for the New Note, the Reorganized Debtor shall execute a security agreement and grant Wells Fargo a security interest in all inventory and accounts then owned and subsequently acquired, and all proceeds of such inventory and accounts, subject only to the Allowed Class 7 and 8 Claims and as to the purchase money security interest of any inventory supplier (the "Security Interest");

(v)     in connection with the New Note, C. Fred Hudson, III and the C. Fred Hudson, III Trust shall execute additional unconditional guaranties for the full amount of the New Note;

(vi)     the Reorganized Debtor shall continue to service the debt obligation of the Allowed Class 12 Unsecured Claim through the period of the Plan; however: (i) if the Release Price option has not been exercised, the balance owed on the Allowed Class 12 Unsecured Claim shall be rolled into the Wells Fargo Obligation, subject to the Wells Fargo Mortgages and paid in full during month forty-eight (48); or (ii) if the Release Price option has been exercised, then the Reorganized Debtor shall be released from any further responsibility for payments as to the Allowed Class 12 Unsecured Claim. The foregoing notwithstanding, C. Fred Hudson, III and the C. Fred Hudson III Trust shall remain liable for any amounts owed on the Allowed Class 12 Unsecured Claim and such amount shall be deemed due and payable therefrom; and

(vii)    C. Fred Hudson, III and the C. Fred Hudson III Trust shall remain jointly and severally liable for the balance owed for the Allowed Class 12 Unsecured Claim, together with any amounts owed under the New Note.

Reorganized Debtor, the Debtors, C. Fred Hudson, III, the C. Fred Hudson, III Trust and any other related party that Wells Fargo might require documentation from ("Debtor Parties") shall execute such documentation as Wells Fargo may require, including but not limited to the Forbearance Agreement, promissory notes, security agreements, mortgage documents, guaranties, agreements and affidavits. The documentation shall contain such waivers, releases, estoppels, confirmations and other information as Wells Fargo may require. All documentation must be satisfactory in form and substance to Wells Fargo and its counsel. Additionally, Debtor Parties shall restate and remake each covenant, representation and warranty contained in the existing loan

documents and shall further admit to having no defenses, setoffs, claims or counterclaims to the enforcement of the loan documents and shall expressly waive and release any defenses, offsets, claims or counterclaims to the enforcement thereof, whether known or unknown. Without limiting the foregoing, at the sole discretion of Wells Fargo, the transactions contemplated shall be documented in such fashion as Wells Fargo determines (e.g. any references to "notes" shall not obligate Wells Fargo to accept a note but may be documented as Wells Fargo shall direct).

      b.      <u>Class 2 – 7976 Properties, Inc.</u>

Class 2 consists of the Allowed Secured Claim of 7976 Properties, Inc. ("7976"). The Claim is allegedly secured by a lien on real property of Hud-Twenty Four 445 S.Yonge, LLC (the "7976 Property"). The 7976 Property shall be transferred to Reorganized Debtor, and 7976 shall retain its lien to the same extent, validity, and priority as existed on the Petition Date.

In full satisfaction of its Allowed Class 2 Claim, 7976 shall retain its lien as stated above and receive a new secured note (the "7976 Note") in the amount of the Allowed Class 2 Claim. The new note shall be paid through the proceeds of core operations. A copy of the proposed new note and mortgage shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who request such.

The 7976 Note, if applicable, shall be in the amount of its Allowed Secured Claim, which claim shall not exceed the market value of 7976's secured interest the 7976 Property. From Effective Date forward, interest will accrue at the Confirmation Rate. Interest will accrue and principal and interest paid as set forth herein based on a thirty (30) year amortization with a final maturity of forty-eight (48) months from the Effective Date. All payments made during the Chapter 11 shall reduce, dollar for dollar, the principal amount of the Class 2 Claim.

7976 shall receive a Class 12 Allowed Unsecured Claim for the difference, if any, between the 7976's Allowed Claim and its Allowed Secured Claim.

The Reorganized Debtor shall remain current on all taxes, subject to challenges by the Debtors for market conditions and taxing authority's property valuation. The Reorganized Debtor shall remain current on all appropriate insurance policies to extent obligated, list 7976 as a loss payee, and provide proof of the same to 7976.

The 7976 Note will have standard and commercially reasonable default provisions, and 7976 will provide the Reorganized Debtor ten (10) days notice of any default with a right to cure. If said Default is not remedied within said 10 day period, the new note will provide for customary remedies. A copy of proposed loan documents will be available for inspection at least ten (10) days prior to the Confirmation Hearing.

c.    Class 3 – Florida Capital Bank, N.A.

Class 3 consists of the Allowed Secured Claim of Florida Capital Bank, N.A. ("Florida Capital"). The Claim is secured by liens on real property of the Debtors (collectively, the "Florida Capital Bank Property"). Florida Capital shall retain its lien to the same extent, validity, and priority as existed on Petition Date.

In full satisfaction of its Allowed Class 3 Claim, Florida Capital shall retain its liens as stated above and receive a new secured note (the "Florida Capital Note") in the amount of the Allowed Class 3 Claim. The new note shall be paid through the proceeds of core operations. A copy of the proposed new note and mortgages shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who request such.

The Florida Capital Note shall be in the amount of its Allowed Secured Claim, which claim shall not exceed the combined market value of the Florida Capital Bank Property. From Effective Date forward, interest will accrue at the Confirmation Rate. Interest will accrue and principal and interest paid as set forth herein based on a thirty (30) year amortization with a final maturity of forty-eight (48) months from the Effective Date. All payments made during the Chapter 11 shall first be applied to accruing interest and then principal.

The amount of the Allowed Secured Claim will be equal to the full amount owed to Florida Capital and there will be no Allowed Unsecured Claim.

The Reorganized Debtor shall remain current on all taxes, subject to challenges by the Debtors for market conditions and taxing authority's property valuation. The Reorganized Debtor shall remain current on all appropriate insurance policies to extent obligated, list Florida Capital as a loss payee, and provide proof of the same to Florida Capital.

The Florida Capital Note will have standard and commercially reasonable default provisions, and Florida Capital will provide the Reorganized Debtor ten (10) days notice of any default with a right to cure. If said Default is not remedied within said 10 day period, the new note will provide for customary remedies. A copy of proposed loan documents will be available for inspection at least ten (10) days prior to the Confirmation Hearing.

c.      Class 4 – Regions Bank.

Class 4 consists of the Allowed Secured Claim of Regions Bank ("Regions"). The Claim is secured by a lien on real property of Hud-Six, LLC (the "Regions Bank Property"). Regions shall retain its lien to the same extent, validity, and priority as existed on Petition Date.

In full satisfaction of its Allowed Class 4 Claim, Regions shall retain its lien as stated above and, as provided hereafter, Hud-6 shall convey the Regions Bank Property, free and clear of any liens and encumbrances except for ad valorem real estate taxes, to Regions (or its assigns) as the indubitable equivalent of its Allowed Secured Claim. All payments made to Regions during the Case shall be applied to principal.

Regions shall have a Class 12 Allowed Unsecured Claim in an amount equal to the difference between Regions Allowed Claim and its Allowed Secured Claim.

To the extent that the Reorganized Debtor and Regions are able to negotiate agreed terms, the Reorganized Debtor may lease back all, or a portion, of the Regions Bank Property (the "Regions Lease"). If the parties reach agreement with respect to the Regions Lease prior to confirmation, the Reorganized Debtor will file a copy of the proposed lease with the Bankruptcy Court.

        d.      <u>Class 5 – GE Commercial Finance</u>.

Class 5 consists of the Allowed Secured Claim of GE Commercial Finance ("GE"). The Claim is secured by a lien on real property of Hudson Furniture Showroom, Inc. at 28342 US Hwy 19N, Clearwater, Florida (the "GE Bank Property"). GE shall retain its lien to the same extent, validity, and priority as existed on Petition Date.

In full satisfaction of its Allowed Class 5 Claim, GE shall retain its lien as stated above and receive a new secured note (the "GE Note") in the amount of the Allowed Class 5 Claim. The new note shall be paid through the proceeds of core operations. A copy of the proposed new note and mortgage shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who request such.

The GE Note shall be in the amount of its Allowed Secured Claim, which claim shall not exceed the market value of the GE Bank Property. From Effective Date forward, interest will accrue at the Confirmation Rate. Interest will accrue and principal and interest paid as set forth herein based on a thirty (30) year amortization with a final maturity of forty-eight (48) months from the Effective Date.

The amount of the Allowed Secured Claim will be equal to the full amount owed to GE and there will be no Allowed Unsecured Claim. All accrued and unpaid interest as of the Effective Date shall be added to the amount of the Allowed Secured Claim and due at maturity.

The Reorganized Debtor shall remain current on all taxes, subject to challenges by the Debtors for market conditions and taxing authority's property valuation. The Reorganized Debtor shall remain current on all appropriate insurance policies to extent obligated, list GE as a loss payee, and provide proof of the same to GE.

The GE Note will have standard and commercially reasonable default provisions, and GE will provide the Reorganized Debtor ten (10) days notice of any default with a right to cure. If said Default is not remedied within said 10 day period, the new note will provide for customary remedies. A copy of proposed loan documents will be available for inspection at least ten (10) days prior to the Confirmation Hearing.

e. Class 6 – Compass Bank.

Class 6 consists of the Allowed Secured Claim of Compass Bank ("Compass"). The Claim is secured by a lien on real property of Hudson Furniture Showroom, Inc.

at 3290 W. SR 46, Sanford, Florida (the "Compass Bank Property"). Compass shall retain its lien to the same extent, validity, and priority as existed on Petition Date.

In full satisfaction of its Allowed Class 6 Claim, Compass shall retain its lien as stated above and receive a new secured note (the "Compass Note") in the amount of the Allowed Class 6 Claim. The new note shall be paid through the proceeds of core operations. A copy of the proposed new note and mortgage shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who request such.

The Compass Note shall be in the amount of its Allowed Secured Claim, which claim shall not exceed the market value of the Compass Bank Property. From Effective Date forward, interest will accrue at the Confirmation Rate. Interest will accrue and principal and interest paid as set forth herein based on a thirty (30) year amortization with a final maturity of forty-eight (48) months from the Effective Date.

The amount of the Allowed Secured Claim will be equal to the full amount owed to Compass and there will be no Allowed Unsecured Claim Note.

The Reorganized Debtor shall remain current on all taxes, subject to challenges by the Debtors for market conditions and taxing authority's property valuation. The Reorganized Debtor shall remain current on all appropriate insurance policies to extent obligated, list Compass as a loss payee, and provide proof of the same to Compass.

The Compass Note will have standard and commercially reasonable default provisions, and Compass will provide the Reorganized Debtor ten (10) days notice of any default with a right to cure. If said Default is not remedied within said 10 day period, the new note

will provide for customary remedies. A copy of proposed loan documents will be available for inspection at least ten (10) days prior to the Confirmation Hearing.

f.    Class 7 – Furniture Brands International - Broyhill.

Class 7 consists of the Allowed Secured Claim of Furniture Brands International – Broyhill ("Broyhill")[7]. The Claim is secured by a lien on, among other things, accounts receivable and inventory of HFS (collectively, the "Broyhill Security"). Broyhill shall retain its lien to the same extent, validity, and priority as existed on Petition Date.

In full satisfaction of its Allowed Class 7 Claim, Broyhill shall retain its lien as stated above and receive a new secured note (the "Broyhill Note") in the amount of $1,800,000.00 (the "Allowed Secured Claim"). The new note shall be paid through the proceeds of furniture sales. A copy of the proposed new note and UCC-1 financing statement shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who request such.

The Broyhill Note shall be in the amount of its Allowed Secured Claim. From Effective Date forward, interest will accrue at the Confirmation Rate. Interest will accrue and principal and interest paid as set forth herein based on a twelve (12) year amortization and a forty-eight (48) month maturity.

Broyhill shall receive a Class 12 Allowed Unsecured Claim for the difference, if any, between the Broyhill Note and its Allowed Claim.

Broyhill shall forbear from exercising any of its rights and/or remedies against guarantor C. Fred Hudson for so long as no default occurs.

On the Effective Date, Broyhill shall return the $400,000 deposit held by Broyhill to the Reorganized Debtor and shall return Reorganized Debtor to standard credit terms provided there is no default under the Broyhill Note.

The Broyhill Note will have standard and commercially reasonable default provisions, and Broyhill will provide the Reorganized Debtor ten (10) days notice of any default with a right to cure. If said Default is not remedied within said 10 day period, the new note will provide for customary remedies. A copy of proposed loan documents will be available for inspection at least ten (10) days prior to the Confirmation Hearing.

g.    Class 8 – La-Z-Boy Incorporated – La-Z-Boy.

Class 8 consists of the Allowed Secured Claim of La-Z-Boy Incorporated and its subsidiaries – La-Z-Boy ("La-Z-Boy"). The Claim is secured by a lien on, among other things, inventory and related accounts receivable of HFS (collectively, the "La-Z-Boy Security"). La-Z-Boy shall retain its lien to the same extent, validity, and priority as existed on Petition Date.

In full satisfaction of its Allowed Class 8 Claim, La-Z-Boy shall retain its lien as stated above and receive a new secured note (the "La-Z-Boy Note") in the amount of the Allowed Class 8 Claim. The new note shall be paid through the proceeds of furniture sales. A copy of the proposed new note and UCC-1 financing statement shall be available at least ten (10) days prior to the Confirmation Hearing and will be provided to any party who request such.

The La-Z-Boy Note shall be in the amount of its Allowed Secured Claim, which claim shall not exceed the combined market value of the La-Z-Boy Security. From

---

7 Pursuant to order of the Bankruptcy Court, Broyhill shall have a perfected first priority lien and security interest in

Effective Date forward, interest will accrue at the Confirmation Rate. Interest will accrue and principal and interest paid as set forth herein based on a twelve (12) year amortization and a forty-eight (48) month maturity.

The amount of the Allowed Secured Claim will be equal to the full amount owed to La-Z-Boy and there will be no Allowed Unsecured Claim Note.

La-Z-Boy shall forbear from exercising any of its rights and/or remedies against guarantor C. Fred Hudson for so long as no default occurs.

The La-Z-Boy Note will have standard and commercially reasonable default provisions, and La-Z-Boy will provide the Reorganized Debtor ten (10) days notice of any default with a right to cure. If said Default is not remedied within said 10 day period, the new note will provide for customary remedies. A copy of proposed loan documents will be available for inspection at least ten (10) days prior to the Confirmation Hearing.

      h.     Class 9 – Valley Commercial Capital.

Class 9 consists of the Allowed Secured Claim of Valley Commercial Capital ("VCC"). The Claim is secured by a lien on, among other things, a 2000 Pilatus Model PC-12 Plane (the "Plane") owned by Hud-Ten, LLC (collectively, the "VCC Security"). VCC shall retain its lien to the same extent, validity, and priority as existed on Petition Date.

In full satisfaction of its Allowed Class 9 Claim, VCC shall retain its lien as stated above and receive a new secured note (the "VCC Note") in the amount of the Allowed Class 9 Claim. The new note shall be paid through the proceeds of furniture sales. A copy of the

---

the amount of at least $1,585,753.20. (HFS, Doc.No. 225).

proposed new note and UCC financing statement shall be available at least ten (10) days prior to the

Confirmation Hearing and will be provided to any party who request such.

The VCC Note shall be in the amount of its Allowed Secured Claim of

$1,860,107.30[8]. From Effective Date forward, interest will accrue at the Confirmation Rate. Interest

will accrue and principal and interest paid monthly, based on a fifteen (15) year amortization and

maturity. All payments made during the Chapter 11 shall first be applied to accruing interest and

then principal.

The amount of the Allowed Secured Claim will be equal to the full

amount owed to VCC and there will be no Allowed Unsecured Claim Note.

The VCC Note will have standard and commercially reasonable

default provisions, and VCC will provide the Reorganized Debtor ten (10) days notice of any default

with a right to cure. If said Default is not remedied within said 10 day period, the new note will

provide for customary remedies. A copy of proposed loan documents will be available for inspection

at least ten (10) days prior to the Confirmation Hearing.

h.     Class 10 – County Tax Collectors.

Class 10 consists of the Allowed Secured Claims of the County Tax

Collectors ("Tax Collectors"), which are secured by a first priority Liens on the respective Debtors'

real property as set forth in **Exhibit "B"** (the "Real Property"). The Holders of Allowed Class 10

Claims shall retain their liens to the same extent, validity, and priority as existed on Petition Date

In full satisfaction of their respective Allowed Secured Claims, the Tax

Collectors shall retain their Liens against the applicable Real Property and receive monthly payments

---

8 Pursuant to order of the Bankruptcy Court VCC's secured claim is an amount certain. (HFS, Doc. No. 216).

based on a thirty (30) year amortization and a forty-eight (48) month maturity with interest at the Statutory Rate. Payments will commence on the First Business Day of the First Calendar month after the Effective Date and continue each month thereafter.

        i.      Class 11 –Tax Certificate Holder.

        Class 11 consists of the Allowed Secured Claims of the Plymouth Park Tax Services, LLC ("Certificate Holder"), which are secured by Liens on HUD-Three, LLC's real property: 4955 S. Florida Ave, Lakeland, FL 33813, and on HUD-Twenty-Four 445 S.Yonge, LLC's real property: 445 S. Yonge Street, Ormond Beach, FL (the "Tax Certificate Properties"). The Holder of Allowed Class 11 Claims shall retain its liens to the same extent, validity, and priority as existed on Petition Date.

        In full satisfaction of its Allowed Secured Claims, Certificate Holder shall retain its Liens against the Tax Certificate Properties and receive monthly payments based on a thirty (30) year amortization and a forty-eight (48) month maturity with interest at the applicable Tax Certificate Rate. Payments will commence on the First Business Day of the First Calendar month after the Effective Date and continue each month thereafter.

        3.      Unsecured Claims.

        Class 12 – Allowed Unsecured Claims.

        Class 12 consists of all Allowed Unsecured Claims of Unsecured Creditors. In full satisfaction of their Allowed Unsecured Claims, Holders of Class 12 Claims shall receive a Pro Rata beneficial interest in the Cash Flow Note. The Cash Flow Note will require a quarterly payment equal to seventy-five (75) percent of the surplus of actual results versus the Operating Budget. The surplus shall be determined quarterly commencing on the First Business Day of the First

Calendar month after the Effective Date and continue each quarter thereafter. Distributions under the Cash Flow Note shall be paid within thirty days after the books have been closed for each applicable quarter.[9] The Cash Flow Note shall terminate forty-eight (48) months from the Effective Date, and the associated payment, if applicable, shall occur in accordance with the established closing and distribution schedule.

    4.    <u>All Equity Interests</u>.

<u>Class 13 - Hudson's Furniture Showroom.</u>

Class 13 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Hudson's Furniture Showroom, LLC. All currently issued and outstanding Equity Interests in the Hudson's Furniture Showroom shall be vested in Joshua L. Hudson (50%) and Adam C. Hudson (50%).

<u>Class 14– Hud-One, LLC.</u>

Class 14 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Hud-One. The Class is impaired as, upon the Effective Date, all currently issued or authorized equity interests in Hud-One shall be canceled and of no further force and effect. Accordingly, the Holders of the Class 14 Interests, except to the extent that they are entitled to Distribution or as other provided elsewhere in the Plan, shall not have an ownership interest in the Reorganized Debtor.

---

9 For example, if the Effective Date falls on the 21st day of February, then the first quarterly period would commence on March 1 and continue through May 31. Assuming the accounting is completed and the books are closed on the June 18th, then the Reorganized Debtor will make its first Distribution under the Cash Flow Note on or before July 18.

### Class 15 – Hud-Three, LLC.

Class 15 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Hud-Three, LLC. The Class is impaired as, upon the Effective Date, all currently issued or authorized equity interests in Hud-Three, LLC shall be canceled and of no further force and effect. Accordingly, the Holders of the Class 15 Interests, except to the extent that they are entitled to Distribution or as other provided elsewhere in the Plan, shall not have an ownership interest in the Reorganized Debtor.

### Class 16 – Hud-Six, LLC

Class 16 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Hud-Six, LLC. The Class is impaired as, upon the Effective Date, all currently issued or authorized equity interests in Hud-Six, LLC shall be canceled and of no further force and effect. Accordingly, the Holders of the Class 16 Interests, except to the extent that they are entitled to Distribution or as other provided elsewhere in the Plan, shall not have an ownership interest in the Reorganized Debtor.

### Class 17– Hud-Ten, LLC

Class 17 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Hud-Ten, LLC. The Class is impaired as, upon the Effective Date, all currently issued or authorized equity interests in Hud-Ten, LLC shall be canceled and of no further force and effect. Accordingly, the Holders of the Class 17 Interests, except to the extent that they are entitled to Distribution or as other provided elsewhere in the Plan, shall not have an ownership interest in the Reorganized Debtor.

### Class 18 – Hud-Twenty-Two, LLC.

Class 18 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Hud-Twenty-Two, LLC. The Class is impaired as, upon the Effective Date, all currently issued or authorized equity interests in Hud-Twenty-Two, LLC shall be canceled and of no further force and effect. Accordingly, the Holders of the Class 18 Interests, except to the extent that they are entitled to Distribution or as other provided elsewhere in the Plan, shall not have an ownership interest in the Reorganized Debtor.

### Class 19 – Hud-Twenty-Four 445 S. Yonge, LLC.

Class 19 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Hud-Twenty-Four 445 S. Yonge, LLC. The Class is impaired as, upon the Effective Date, all currently issued or authorized equity interests in Hud-Twenty-Four 445 S. Yonge shall be canceled and of no further force and effect. Accordingly, the Holders of the Class 19 Interests, except to the extent that they are entitled to Distribution or as other provided elsewhere in the Plan, shall not have an ownership interest in the Reorganized Debtor.

### Class 20- Hud-Twenty-Seven Mason, LLC.

Class 20 consists of any and all membership interests, common stock, stock options, and warrants currently issued or authorized in Hud-Twenty-Seven Mason, LLC. The Class is impaired as, upon the Effective Date, all currently issued or authorized equity interests in Hud-Twenty-Seven Mason, LLC shall be canceled and of no further force and effect. Accordingly, the Holders of the Class 20 Interests, except to the extent that they are entitled to Distribution or as other provided elsewhere in the Plan, shall not have an ownership interest in the Reorganized Debtor.

C.    Means of Implementation.

   1.    Business Operations and Cash flow.

The Plan contemplates that the Hud Affiliates will merge into HFS as the surviving entity. HFS, the Reorganized Debtor will continue to operate its reorganized business, with low operating expenses. The Plan contemplates that the Reorganized Debtor shall execute new notes, mortgages, and security agreements with its secured creditors; provided, however, at the option of the lender, Reorganized Debtor shall simply affirm and modify existing documents. The Debtors believe the cash flow generated from core operations along with a reduction in cash flow demands from the New Secured Obligations will be sufficient to meet operating needs and required Plan Payments.

   2.    Funds Generated During Chapter 11.

All cash in excess of operating expenses generated from operations until the Effective Date will be used for Plan Payments.

   3.    Merger of Hud Affiliates into HFS.

In light of the Debtors' unique corporate structure and conduct of their business affairs, the Plan proposes, and its terms embody, the statutory merger of the Hud Affiliates into HFS, which entity shall survive as the Reorganized Debtor. The emergence of a single Reorganized Debtor reflects the Debtors focus on economic and management efficiency going forward.

4. <u>Management and Control of Reorganized Debtor</u>.

i.<u>Directors</u>.

The operations of the Reorganized Debtor shall be overseen by its Board of Directors. The Board of Directors shall have the power to request and obtain all financial data and operational information regarding the Reorganized Debtor at any time. The Board of Directors shall have all corporate authority vested in boards of directors under the applicable laws of the State of Florida including the power to appoint and terminate officers and to liquidate the Reorganized Debtor and to wind up its affairs, with all such powers to be exercised by a majority vote.

Messrs. C. Fred Hudson, Joshua L. Hudson and Adam C. Hudson shall serve as initial directors. Mr. C. Fred Hudson shall serve as Chairman of the Board. The initial Directors shall continue to serve until either (i) Reorganized Debtor ceases to do business, or (ii) a Director resigns or is replaced by the shareholders in accordance with Florida law. The Directors shall be entitled to receive reasonable compensation.

ii.<u>Officers</u>.

No officer of Reorganized Debtor shall have the authority to sell substantially all of the assets of Reorganized Debtor or to liquidate Reorganized Debtor unless a majority of the Directors of Reorganized Debtor approves such actions. Should a majority of the Directors of Reorganized Debtor instruct the officers of Reorganized Debtor to take such actions, the officers of Reorganized Debtor shall follow such instructions to the best of their abilities.

Mr. C. Fred Hudson shall be the initial Chief Executive Officer of Reorganized Debtor, and Mr. Joshua L. Hudson shall be the President of Reorganized Debtor. Mr.

Adam C. Hudson shall be the Vice President and Secretary. After discussions with several of the Debtors secured creditors, it is Reorganized Debtor's belief that the continued involvement of the officers is a condition precedent to the concessions received herein from the secured creditors and lenders and is crucial to Reorganized Debtor's go-forward success. In addition to Mr. C. Fred Hudson's role in developing and coordinating the plan set forth herein, he has absorbed several job functions post-filing, implemented numerous corporate and overhead cost controls and has established a small management team that reports directly to Mr. C. Fred Hudson in executing the day to day operational strategy.

In light of the foregoing, coupled with Mr. C. Fred Hudson's intimate knowledge of Reorganized Debtor's operations and critical role in the continued operations of the Reorganized Debtor, the continued employment of Mr. C. Fred Hudson is a critical prerequisite to Reorganized Debtor's feasibility.

The President shall have authority to conduct the operations of Reorganized Debtor and shall delegate such authority to other officers as the Board of Directors may direct. The President, Chief Financial Officer, and Vice President of Reorganized Debtor shall have the powers, duties, and responsibilities typically held by such officers in companies similar to Reorganized Debtor and, in addition, shall be responsible for promptly providing any Director with all information regarding Reorganized Debtor which such Director may request. The officers of Reorganized Debtor shall be entitled to reasonable compensation as determined by respective management contracts, and, if no contract exists, as fixed by the Board of Directors.

5. <u>Reorganized Debtor</u>.

After Confirmation, the common stock of the Equity Holders shall remain as set forth herein. The current officers and directors of the Reorganized Debtor shall remain as set forth herein.

6. <u>Disbursements.</u>

All Disbursements made pursuant to this Plan shall be paid by the Reorganized Debtor from cash flow generated by core operations.

D. <u>Other Provisions</u>.

1. <u>Leases and Executory Contracts</u>.

The Plan provides that the Debtors shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not rejected by such date, then such unexpired lease or executory contract shall be deemed rejected. It is the position of the Debtors that the executory contracts listed in the respective Schedules of Executory Contracts filed pursuant to Rule 1007, are the only executory contracts to which any of the Debtors was a party on the Petition Date. The Plan also provides for the Bankruptcy Court to retain jurisdiction as to certain matters as stated in the Plan, including, without limitation, prosecution of all Causes of Action and objections to Claims.

To the extent any executory contract or lease is rejected by operation of this provision, any party asserting a Claim, pursuant to Sections 365 and 502(g) of the Code, arising from such rejection shall file a proof of such Claim within thirty (30) days after the entry of an

Order Confirming the Plan, and any Allowed Claim resulting from such rejection shall be a Class 12 Claim except as otherwise provided herein.

           2.      Procedures For Resolving Disputed Claims.

              a.      Prosecution of Objections to Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, the Debtors or Reorganized Debtor shall have the exclusive right to make and file objections to all Claims. All objections commenced prior to Confirmation Date shall be finished by the Reorganized Debtor.

Pursuant to the Plan, unless another time is set by order of the Bankruptcy Court, all objections to Claims and Equity Interests shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims and Equity Interests to which objections are made within 90 days after the Confirmation Date.

Except as may be specifically set forth in the Plan, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that, any Debtor had immediately prior to the commencement of the Chapter 11 Cases, against or with respect to any Claim or Equity Interest. Except as set forth in the Plan, upon Confirmation, the Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that any Debtor had immediately prior to the commencement of the Chapter 11 Cases as if the Chapter 11 Cases had not been commenced.

42

b.    Estimation of Claims.

Pursuant to the Plan, the Debtors may, at any time, request that the Bankruptcy Court estimate any contingent, disputed or unliquidated Claim pursuant to Section 502(c) of the Code regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, disputed or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

c.    Cumulative Remedies.

In accordance with the Plan, all of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Until such time as an Administrative Claim, Claim or Equity Interest becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim, Disputed Claim or Disputed Equity Interest for purposes related to allocations, Distributions, and voting under the Plan.

d.      Payments and Distributions on Disputed Claims.

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid by the Reorganized Debtor, such that the Holder of such Allowed Claim receives all payments and Distributions to which such Holder is entitled under the Plan in order to bring payments to the affected Claimants current with the other participants in the particular Class in question. Except as otherwise provided in the Plan, no partial payments and no partial Distributions will be made with respect to a Disputed Claim until the resolution of such disputes by settlement or Final Order. Unless otherwise agreed by the Reorganized Debtor or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a Distribution until such dispute is resolved by settlement or Final Order.

e.      Allowance of Claims and Interests.

(i).     Disallowance of Claims.

According to the Plan, all Claims held by Entities against whom any Debtor has obtained a Final Order establishing liability for a cause of action under Sections 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Code ("Causes of Action") shall be deemed disallowed pursuant to Section 502(d) of the Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that Entity have been settled or resolved by a Final Order and all sums due the related Debtor by that Entity are turned over to such Debtor. Debtors reserve and shall have the exclusive right and authority to bring any Causes of Action.

(ii). Allowance of Claims.

Except as expressly provided in the Plan, no Claim or Equity Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in the Chapter 11 Cases, unless and until such Claim or Equity Interest is deemed Allowed under the Code or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim or Equity Interest.

f.     Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtors' interpretation of the Plan shall govern.

3.     Effect of Confirmation.

a.     Authority to Effectuate the Plan.

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order will act as an order modifying the respective Debtors' by-laws such that the provisions of this Plan can be effectuated. The Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan.

b. Post-Confirmation Status Report.

Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Debtors will file status reports with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee, and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## IV. CONFIRMATION

A. Confirmation Hearing.

Section 1128 of the Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

Counsel for the Debtors:

R. Scott Shuker, Esquire
Latham, Shuker, Eden & Beaudine, LLP
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801

Debtors:

Hudson Furniture Showrooms, Inc.
Attn: C. Fred Hudson, III
3290 W. SR 46
Sanford, FL 32771

United States Trustee:

135 West Central Blvd.
Suite 620
Orlando, Florida 32801

B.    Financial Information Relevant to Confirmation.

Attached as Exhibits to the Disclosure Statement are the following:

(i) **Exhibit "D"** is a copy of Debtors' financial projections for the first three years of Plan Payments. The projections indicate that the Reorganized Debtor's operational cash flow will be sufficient to service the required Plan Payments at a debt level as described herein using an anticipated Effective Date of November 30, 2010. The projections and other financial information has been provided by and prepared by the Debtors' management. The projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. These projections are based upon a variety of estimates and assumptions which may not be realized. The projections are based on assumptions existing as of June 1, 2010 and have not materially changed.

(ii) **Exhibit "E"** is a copy of Debtors' Chapter 7 liquidation analysis ("Liquidation Analysis") establishing that Creditors of Debtors will fair materially poorer in the event the Debtors are forced into Chapter 7 as compared to the Plan.

C.      Confirmation Standards.

For a plan of reorganization to be confirmed, the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept the plan, that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met. Debtors believe that the Plan satisfies all of the requirements for Confirmation.

1.      Best Interests Test.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if Debtors were, on the Effective Date, liquidated under Chapter 7 of the Code. Debtors believe that satisfaction of this test is established by the Liquidation Analysis.

To determine what holders of Claims and Equity Interests would receive if Debtors were liquidated, the Bankruptcy Court must determine how the assets and properties of Debtors would be liquidated and distributed in the context of a Chapter 7 liquidation case.

Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by Debtors during the Chapter 11 Cases, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors and holders of Equity Interests would receive meaningful distributions. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Payment.

Debtors have carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Equity Interests, including the following:

a. the possible costs and expenses of the Chapter 7 trustee or trustees;

b. the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for Debtors' assets caused by the forced Chapter 7 liquidation; and

c. the possible substantial increase in Claims, which would rank prior to or on a parity with those of Unsecured Creditors.

2.      <u>Financial Feasibility</u>.

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Debtors unless the liquidation is proposed in the Plan. As reflected in **Exhibit "D"**, Debtors believe that core operations will generate sufficient cash flow to make all Plan Payments as noted herein. Based upon the financial projections, Debtors assert that the Plan is feasible and Confirmation is not likely to be followed by further financial reorganization.

3.      <u>Acceptance by Impaired Classes</u>.

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless (i) the legal, equitable and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any

default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

    4.    <u>Confirmation Without Acceptance by all Impaired Classes; "Cramdown."</u>

The Code contains provisions that enable the Bankruptcy Court to confirm the Plan, even though the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class of Claims. Section 1129(b)(1) of the Code states:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly, and it is fair and equitable with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.

**DEBTORS BELIEVE THAT, IF NECESSARY, THEY WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO THE NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.    Consummation.

The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Bankruptcy Court, the Effective Date occurs, and the Reorganized Debtor and applicable parties reach agreement on any required documents. It will not be necessary for the Reorganized Debtor to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E.    Exculpation from Liability.

The Debtors, the Reorganized Debtor, their respective members, Managers, officers, and directors and their respective Professionals (acting in such capacity) shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the plan or the Reorganization Case; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to the Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Reorganization Case. The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtors, the Reorganized

Debtor, and their respective agents have or obtain pursuant to any provision of the Code or other applicable law, or any agreement. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions hereof shall not release or be deemed a release of any of the Causes of Action otherwise preserved by the Plan. The terms of this exculpation shall only apply to liability arising from actions taken on or prior to the Effective Date.

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION. MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT ASSERTING ANY SUCH LIABILITY WITHIN THIRTY (30) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED.**

Notwithstanding the foregoing, (i) the Reorganized Debtor shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan and (ii) the Debtors' respective members, Managers or executive officers shall not be relieved or released from any personal contractual liability except as otherwise provided in the Plan.

F.    <u>Police Power</u>.

Nothing in this Article IV shall be deemed to effect, impair, or restrict any federal or state governmental unit from pursuing its police or regulatory enforcement action against any person or entity, other than to recover monetary claims against the Debtors for any act, omission, or event occurring prior to Confirmation Date to the extent such monetary claims are discharged pursuant to Section 1141 of the Code.

G.   Revocation and Withdrawal of this Plan.

The Debtors reserve the right to withdraw this Plan at any time before entry of the Confirmation Order. If (i) the Debtors revoke and withdraw this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not substantially consummated, or (v) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

H.   Modification of Plan.

The Debtors may seek to amend or modify this Plan in accordance with Section 1127(b) of the Code, remedy any defect or omission, or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

On or before substantial consummation of the Plan, the Debtors, may issue, execute, deliver or file with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

## V.   INJUNCTION.

A.   Recipient

C. Fred Hudson is the president, chairman of the board of directors, and the ultimate controlling person, of each of the Debtors. C. Fred Hudson has been involved with the acquisition and development of each of the Debtors' properties and business operations since their inception. As a consequence of his intricate involvement with the Debtors' business development and financial affairs, C. Fred Hudson is obligated on numerous direct, limited, or conditional guarantees of the Debtors' financial obligations, and as a result is liable under those contractual undertakings as accommodation parties for the Debtors or as direct obligations on account of credit obtained for the benefit of the Debtors on substantially all of the Debtors' business and operational indebtedness.

Additionally, by reason of his status as an officer, director, and control person of the Debtors' business activities, C. Fred Hudson risks exposure to potential litigation related to claims arising from the Debtors' operations. C. Fred Hudson estimates his potential exposure on contractual recourse liability for the Debtors' business obligations and other Debtor related non-contractual claims to exceeds $60,000,000.00.

The Debtors believe that C. Fred Hudson has contributed significant value to the Debtors' estates, and will continue to contribute value to the Reorganized Debtor.

On the Effective Date of the Plan, C. Fred Hudson has will also waive his direct or indirect Claims against the Debtors in full. In consideration of the substantial contributions made and to be made by C. Fred Hudson, the Plan contemplates the granting of broad, conditional third-party injunctions of pursuit against C. Fred Hudson of claims arising out of and deriving from the business operations and financial affairs of the Debtors.

B.     Conditional Injunction

The Plan is premised upon the injunctions contained below. Debtors assert the injunctions are being given as consideration for the accommodations provided by C. Fred Hudson under the Plan and are fair consideration for property contributed and valuable services. The Debtors further believe that unless the settlement is binding on all parties through confirmation of the Plan, protracted and costly litigation would ensue, distributions to Creditors would be substantially delayed and the Debtors would not be restructured and reorganized.

Except as expressly provided in the Plan or to otherwise enforce the terms of the Plan, as of the Confirmation Date, all Persons that have held, currently hold or may hold a Claim, other debt or liability, an Interest, or other right of an equity security that is impaired or terminated pursuant to the terms of the Plan, to the fullest extent permitted by applicable law, are enjoined from

taking any of the following actions, as long as Reorganized Debtor, C. Fred Hudson, III, and the C. Fred Hudson III Trust are not in default of any obligation under the Plan or any agreements contemplated by the Plan and except as specifically provided for in the Plan, on account of any such impaired or terminated Claims, debts or liabilities, Interests or rights: (i) commencing or continuing in any manner any action or proceeding against C. Fred Hudson, or his property interests, other than to enforce any right pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against C. Fred Hudson, or his property interests, other than as permitted pursuant to (i) above; (iii) creating, perfecting, or enforcing any lien or encumbrance against C. Fred Hudson, or his property interests; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to C. Fred Hudson; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

From and after the Confirmation Date, the Injunctions described Article VIII in the Plan and Article V herein shall become effective, and all Holders of Claims and Interests shall be enjoined from commencing or continuing any of the actions detailed herein for so long as Reorganized Debtor, C. Fred Hudson, III, and the C. Fred Hudson III Trust remain in compliance with the Plan or any agreements contemplated by the Plan and except as specifically provided for in the Plan.

## VI. ALTERNATIVE TO THE PLAN.

If the Plan is not confirmed and consummated, Debtors believe that the most likely alternative is a sale of the Debtors or a liquidation of the Debtors under Chapter 7 or 11 of the Code. In a liquidation or sale, Debtors believe the deficiency claims from the secured lenders could be as much as $15,000,000, and, as such, the pool of Allowed Unsecured (Class 12) Claims would be

increased and the dividend to such group greatly diminished. Debtors believe that liquidation of all real and personal property in a Chapter 7 scenario would dramatically reduce the total amount available to Creditors. In a case under Chapter 7 of the Code, a trustee would be elected or appointed to liquidate the assets of Debtors for distribution to Creditors in accordance with the priorities established by the Code. Debtors' analysis of the probable recovery to Creditors and holders of Equity Interest is set forth in the Liquidation Analysis.

## VII.    CONCLUSION.

Debtors recommend that holders of Claims and Interests vote to accept the Plan.

**DATED** this 24th day of September 2010 in Orlando, Florida.

/s/ R. Scott Shuker
R. Scott Shuker
Florida Bar No: 984469
Victoria Kothari
Florida Bar No. 0730831
**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801
Tel: 407-481-5800
Fax: 407-481-5801
*Attorneys for Debtors*

## Exhibit A

### LIST OF DEBTORS

| Debtor | Case Number | Entity |
|---|---|---|
| In re Hudson's Furniture Showroom, LLC | Case No. 6:10-bk-03322-KSJ | Main |
| In re Hud-One, LLC | Case No. 6:10-bk-03543-KSJ | Affiliate |
| In re Hud-Three, LLC | Case No. 6:10-bk-03544-KSJ | Affiliate |
| In re Hud-Six, LLC | Case No. 6:10-bk-03545-KSJ | Affiliate |
| In re Hud-Ten, LLC | Case No. 6:10-bk-03546-KSJ | Affiliate |
| In re Hud- Twenty-Two, LLC | Case No. 6:10-bk-03547-KSJ | Affiliate |
| In re Hud-Twenty Four 445 S. Yonge, LLC | Case No. 6:10-bk-03548-KSJ | Affiliate |
| In re Hud-Twenty-Seven Mason, LLC | Case No. 6:10-bk-03549-KSJ | Affiliate |

## Exhibit B

### LIST OF THE DEBTORS' REAL PROPERTIES

| DEBTOR | PROPERTY ADDRESS | RETAIL SPACE | TENANT |
|---|---|---|---|
| HFS | 3290 W. SR 46, Sanford, FL 32771 | 131,132± sq. ft. of distribution / warehouse / showroom space | HFS |
| HFS | 8796 S. Tamiami Trail, Sarasota County FL, 34231 | 34,384± sq. ft. of retail/showroom space | HFS |
| HFS | 9539 S. OBT, Orlando, FL 32837 | 14,100± sq. ft. of retail space | HFS |
| HFS | 684 E. Altamonte Dr, Altamonte Springs, FL 32701 | 14,701± sq. ft. of retail space | Office Environments |
| HFS | 11221 E. Colonial Dr, Orlando, FL 32817 | 15,498± sq. ft. of retail space | HFS |
| HFS | 28342 US Hwy 19, Clearwater, FL | | |
| HUD-1 | 3300 & 3320 W SR 46, Sanford, FL 32771 | | |
| HUD-1 | 3310 W. SR 46, Sanford, FL 32771 | 4.24± Gross Acres with two buildings containing 10,580 sq. ft. of retail. (Very poor condition – appraisal at land value only) | (1) 4,180± sq. ft – Utility Trailer Retail Store;<br>(2) 6,400± sq. ft - Vacant |
| HUD-3 | 4955 S. Florida Ave., Lakeland, FL 33813 | 31,254± sq. ft. of showroom/warehouse space | HFS |
| HUD-6 | 4260 W. New Haven Ave., Melbourne, FL | | |
| HUD-22 | 9001 US Highway 19, N. Pinellas Park, FL | | |
| HUD-24 | 445 S. Yonge Street, Ormond Beach, FL | | |
| HUD-27 | 1640 Mason Ave., Daytona Beach, FL 32114 | 35,200± sq. ft. dock height, multi-tenant office / warehouse space | HFS |

## Exhibit C

**TRANSFERRED PROPERTIES**

| Debtor | Property |
|---|---|
| HUD-1 | 3310 W. SR 46, Sanford, FL 32771 |
| HUD-27 | 1640 Mason Ave., Daytona Beach, FL 32114 |
| Hud-Fourteen, LLC | Vacant commercial lot on the west side of Orange Blossom Trail in Orlando, Florida[10] |

---

10 Note – This property is being transferred by a non-debtor entity. Hud-Fourteen, LLC, a non-debtor, is affiliated and related to the Debtors.

# Exhibit D

Hudson's Furniture Showroom, Inc. – Forecast Statements of Revenue & Expenses – All stores except Park National (US Bank)

| | September-10 | % | October-10 | % | Q3 FY2011 | % | Q4 FY2011 | % | Total FYE2011 | % | Q1 FY2012 | % | Q2 FY2012 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 61.41% | | 61.41% | | 61.41% | | 61.41% | | 61.41% | | 61.41% | | 61.41% | |
| **Revenue:** | | | | | | | | | | | | | | |
| Total Sales | 1,775,228 | 100.00% | 1,880,887 | 100.00% | 5,720,150 | 100.00% | 5,616,353 | 100.00% | 22,401,732 | 100.00% | 5,696,174 | 100.00% | 5,478,656 | 100.00% |
| **Cost of Sales** | | | | | | | | | | | | | | |
| Inventory Purchases | 988,951 | 55.71% | 1,046,863 | 55.66% | 3,183,063 | 55.65% | 3,126,172 | 55.66% | 12,474,401 | 55.68% | 3,171,357 | 55.68% | 3,051,039 | 55.71% |
| Other Cost of Goods Sold | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 2,063 | 0.01% | 0 | 0.01% | 0 | 0.00% |
| Vendor Rebates | (22,458) | -1.27% | (23,020) | -1.27% | (72,552) | -1.27% | (71,380) | -1.27% | (202,231) | -1.18% | (72,189) | -1.27% | (69,381) | -1.27% |
| Total Cost of Sales | 966,493 | 54.44% | 1,023,820 | 54.39% | 3,110,539 | 54.39% | 3,054,880 | 54.39% | 12,217,533 | 54.54% | 3,099,167 | 54.54% | 2,981,696 | 54.44% |
| **Gross profit** | 808,762 | 45.56% | 857,866 | 45.61% | 2,609,611 | 45.62% | 2,561,373 | 45.61% | 10,184,199 | 45.46% | 2,597,007 | 45.46% | 2,494,980 | 45.56% |
| **Operating Expenses:** | | | | | | | | | | | | | | |
| Advertising | 120,000 | 6.76% | 125,000 | 6.85% | 314,000 | 5.49% | 314,000 | 5.59% | 1,486,327 | 6.63% | 330,000 | 5.79% | 317,000 | 5.79% |
| Auto Expenses | 37,500 | 2.1% | 37,500 | 1.99% | 112,500 | 1.97% | 112,500 | 2.00% | 455,212 | 2.03% | 113,625 | 1.99% | 113,625 | 2.07% |
| Bad Debt/Recovery | 4,000 | 0.23% | 4,000 | 0.21% | 12,000 | 0.21% | 12,000 | 0.21% | 41,446 | 0.19% | 12,120 | 0.21% | 12,120 | 0.22% |
| Bank and C.C. charges | 31,888 | 1.80% | 33,864 | 1.80% | 103,040 | 1.80% | 101,099 | 1.80% | 402,756 | 1.80% | 102,474 | 1.80% | 98,888 | 1.80% |
| Contract Services | 2,000 | 0.11% | 2,000 | 0.11% | 6,000 | 0.10% | 6,000 | 0.11% | 37,163 | 0.17% | 6,060 | 0.11% | 6,060 | 0.11% |
| Contract Labor - Delivery | 25,000 | 1.41% | 25,000 | 1.33% | 75,000 | 1.31% | 75,000 | 1.34% | 296,773 | 1.32% | 75,750 | 1.33% | 75,750 | 1.38% |
| Contributions/Donations | 250 | 0.01% | 250 | 0.01% | 750 | 0.01% | 750 | 0.01% | 2,260 | 0.01% | 758 | 0.01% | 758 | 0.01% |
| Computer Expense | 6,000 | 0.34% | 6,000 | 0.32% | 18,000 | 0.31% | 18,000 | 0.32% | 83,461 | 0.37% | 18,180 | 0.32% | 18,180 | 0.33% |
| Depreciation & Amortization | 68,659 | 3.87% | 68,659 | 3.65% | 205,977 | 3.60% | 205,977 | 3.67% | 829,779 | 3.70% | 205,977 | 3.62% | 205,977 | 3.76% |
| Dues, Fees & Subscript. | 500 | 0.03% | 500 | 0.03% | 1,500 | 0.03% | 1,500 | 0.03% | 33,078 | 0.15% | 1,515 | 0.03% | 1,515 | 0.03% |
| Entertainment | 2,500 | 0.14% | 2,500 | 0.13% | 7,500 | 0.13% | 7,500 | 0.13% | 32,699 | 0.15% | 7,575 | 0.13% | 7,575 | 0.14% |
| Equipment Maintenance | 500 | 0.03% | 500 | 0.03% | 1,500 | 0.03% | 1,500 | 0.03% | 9,867 | 0.04% | 1,515 | 0.03% | 1,515 | 0.03% |
| Equipment Rental | 8,000 | 0.45% | 8,000 | 0.43% | 24,000 | 0.42% | 24,000 | 0.43% | 86,580 | 0.39% | 24,240 | 0.43% | 24,240 | 0.44% |
| Insurance - Auto | 6,500 | 0.37% | 6,500 | 0.35% | 19,500 | 0.34% | 19,500 | 0.35% | 59,453 | 0.27% | 19,695 | 0.35% | 19,695 | 0.36% |
| Insur-Genl/Worker's Comp. | 26,500 | 1.49% | 27,000 | 1.44% | 81,000 | 1.42% | 81,000 | 1.44% | 325,841 | 1.45% | 81,810 | 1.44% | 81,810 | 1.49% |
| Insurance - Health & Life | 22,050 | 1.24% | 22,050 | 1.17% | 66,150 | 1.16% | 66,150 | 1.18% | 285,532 | 1.27% | 66,408 | 1.17% | 66,408 | 1.21% |
| Miscellaneous expense | 5,000 | 0.28% | 5,000 | 0.27% | 15,000 | 0.26% | 15,000 | 0.27% | 65,850 | 0.29% | 15,150 | 0.27% | 15,150 | 0.28% |
| Outside Commision/Consult | 8,400 | 0.47% | 8,400 | 0.45% | 25,200 | 0.44% | 25,200 | 0.45% | 114,789 | 0.51% | 25,452 | 0.45% | 25,452 | 0.46% |
| Payroll Expense/Taxes | 391,900 | 22.07% | 403,070 | 21.43% | 1,260,072 | 22.03% | 1,254,001 | 22.22% | 4,979,340 | 22.23% | 1,282,467 | 22.16% | 1,239,053 | 22.62% |
| Permits and Licenses | 500 | 0.03% | 500 | 0.03% | 1,500 | 0.03% | 1,500 | 0.03% | 4,384 | 0.02% | 1,515 | 0.03% | 1,515 | 0.03% |
| Promotion and Gifts | 750 | 0.04% | 750 | 0.04% | 2,250 | 0.04% | 2,250 | 0.04% | 2,707 | 0.01% | 2,273 | 0.04% | 2,273 | 0.04% |
| Professional Fees | 20,000 | 1.13% | 20,000 | 1.06% | 60,000 | 1.05% | 60,000 | 1.07% | 388,912 | 1.65% | 60,600 | 1.06% | 60,600 | 1.11% |
| Property Taxes | 38,140 | 2.15% | 38,140 | 2.03% | 117,421 | 2.05% | 117,421 | 2.09% | 469,886 | 2.10% | 117,421 | 2.06% | 117,421 | 2.14% |
| Rent | 123,000 | 6.93% | 123,000 | 6.54% | 247,683 | 4.33% | 197,440 | 3.52% | 1,110,323 | 4.96% | 213,350 | 3.75% | 228,440 | 4.17% |
| Service Expense | 21,500 | 1.21% | 21,500 | 1.14% | 64,500 | 1.13% | 64,500 | 1.15% | 253,682 | 1.13% | 65,145 | 1.14% | 65,145 | 1.19% |
| Repairs & Maintenance | 7,500 | 0.42% | 7,500 | 0.40% | 22,500 | 0.39% | 22,500 | 0.40% | 161,588 | 0.72% | 22,725 | 0.40% | 22,725 | 0.41% |
| Lawn Care/Landscaping | 6,525 | 0.37% | 6,555 | 0.35% | 20,700 | 0.36% | 20,700 | 0.37% | 75,399 | 0.34% | 20,907 | 0.37% | 20,907 | 0.38% |
| Restructuring Costs | 7,500 | 0.42% | 7,500 | 0.40% | 20,700 | 0.36% | 20,700 | 0.37% | 91,814 | 0.41% | 20,907 | 0.37% | 20,907 | 0.38% |
| Security | 4,197 | 0.24% | 4,500 | 0.24% | 13,500 | 0.24% | 13,500 | 0.24% | 58,736 | 0.26% | 13,635 | 0.24% | 13,635 | 0.25% |
| Showroom Supplies | 500 | 0.03% | 500 | 0.03% | 1,500 | 0.03% | 1,500 | 0.03% | 8,684 | 0.04% | 1,515 | 0.03% | 1,515 | 0.03% |
| Taxes & Licenses | 10,250 | 0.58% | 10,250 | 0.54% | 30,750 | 0.54% | 30,750 | 0.55% | 118,743 | 0.53% | 31,058 | 0.55% | 31,058 | 0.57% |
| Travel | 4,000 | 0.23% | 4,000 | 0.21% | 12,000 | 0.21% | 12,000 | 0.21% | 38,761 | 0.17% | 12,120 | 0.21% | 12,120 | 0.22% |
| Uniforms | 50 | 0.00% | 50 | 0.00% | 150 | 0.00% | 150 | 0.00% | 6,000 | 0.03% | 152 | 0.00% | 152 | 0.00% |
| Utilities | 51,350 | 2.89% | 51,350 | 2.73% | 154,050 | 2.69% | 154,050 | 2.74% | 616,236 | 2.75% | 156,919 | 2.75% | 156,919 | 2.87% |
| Warehouse Supplies | 2,000 | 0.11% | 2,000 | 0.11% | 6,000 | 0.11% | 6,000 | 0.11% | 32,241 | 0.14% | 6,060 | 0.11% | 6,060 | 0.11% |
| Minus O/H Allocated to US Bank Stores | (236,105) | -13.30% | (250,158) | -13.30% | (727,031) | -12.71% | (718,893) | -12.80% | (3,062,317) | -13.67% | (750,186) | -13.17% | (720,443) | -13.15% |
| Total Operating Expenses | 831,620 | 46.86% | 848,338 | 45.10% | 2,391,108 | 45.10% | 2,313,015 | 41.80% | 10,019,285 | 44.73% | 2,355,271 | 41.35% | 2,307,143 | 42.07% |
| **Excess (Deficit) of Revenue over Expenses** | (22,858) | -1.59% | 9,528 | 0.50% | 218,503 | 3.82% | 248,358 | 4.42% | 164,914 | 0.74% | 241,736 | 4.24% | 187,837 | 3.43% |
| **Other Income (Expenses):** | | | | | | | | | | | | | | |
| Miscellaneous Income | 17,017 | 0.96% | 17,017 | 0.90% | 51,051 | 0.90% | 51,051 | 0.91% | 288,426 | 1.06% | 51,051 | 0.90% | 51,051 | 0.93% |
| Finance Co. Usage Charge | (12,468) | -0.70% | (13,216) | -0.70% | (40,129) | -0.70% | (39,449) | -0.70% | (148,199) | -0.66% | (40,056) | -0.70% | (38,681) | -0.70% |
| Interest Expense | (9,760) | -0.55% | (9,748) | -0.52% | (29,753) | -0.52% | (29,646) | -0.53% | (140,638) | -0.63% | (41,989) | -0.74% | (121,268) | -2.21% |
| Total Other Income (Expense) | (5,211) | -0.29% | (5,947) | -0.32% | (18,831) | -0.33% | (18,044) | -0.32% | (289,999) | -1.91% | (30,994) | -0.54% | (108,898) | -5.12% |
| **Excess (Deficit) of Revenue over Expenses before Income Tax** | (28,069) | -1.59% | 3,586 | 0.19% | 21,948 | 0.38% | (35,585) | -0.63% | (164,189) | -0.73% | (41,989) | -0.73% | (122,887) | -2.24% |
| Income Tax Expense (Refund) | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Excess (Deficit) of Revenue over Expenses | (28,069) | -1.59% | 3,586 | 0.19% | 21,948 | 0.38% | (35,585) | -0.63% | (164,189) | -0.73% | (41,989) | -0.73% | (122,887) | -2.24% |
| **Non Cash Expenses** | | | | | | | | | | | | | | |
| Property Tax Accrual | 39,140 | | 39,140 | | 117,421 | | 117,421 | | 469,695 | | 117,421 | | 117,421 | |
| Depreciation/Amortization | 68,659 | | 68,659 | | 205,977 | | 205,977 | | 829,779 | | 205,977 | | 205,977 | |
| Cash Flow From Operations | 79,546 | 4.48% | 111,388 | 5.92% | 345,346 | 5.82% | 287,813 | 6.04% | 1,036,298 | 4.65% | 281,834 | 4.95% | 200,741 | 3.87% |
| Change in Net Working Capital - A/R | (102,000) | | (103,000) | | | | | | | | | | | |
| Working Capital - Inventory Adjustment | (110,000) | | (110,000) | | | | | | | | | | | |
| Change in Capex | 15,351 | | 15,351 | | 15,351 | | 46,054 | | 192,606 | | 46,054 | | 46,054 | |
| Distributions | | | | | | | | | | | | | | |

Hudson's Furniture Showroom, Inc. - Forecast Statements of Revenue & Expenses - All stores except Park National (US Bank)

# Exhibit D

| | September-10 | % | October-10 | % | Q3 FY 2011 | % | Q4 FY 2011 | % | Total FYE 2010/2011 | % | Q1 FY 2012 | % | Q2 FY 2012 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 61.41% | | 61.41% | | 61.41% | | 61.41% | | 61.41% | | 61.41% | | 61.41% |
| **Revenue:** | | | | | | | | | | | | | | |
| Free Cash Flow for Debt Payment | 204,897 | 11.54% | 267,440 | 14.22% | 609,995 | 10.66% | 301,759 | 5.37% | 1,603,672 | 7.16% | 235,780 | 4.14% | 154,667 | 2.82% |
| | | | | | | | | | | | | | | |
| **Additional Cash Outlays** | | | | | | | | | | | | | | |
| Principal Loan/Lease Payments exc "rent" | 11,504 | | 11,504 | | 34,511 | | 34,511 | | 114,384 | | 34,511 | | 34,511 | |
| Principal on restructured real estate debt (incl F | 4,672 | | 4,688 | | 31,470 | | 40,563 | | 86,050 | | 41,037 | | 41,515 | |
| Principal on restructured FBI debt | 0 | | 0 | | 12,680 | | 19,220 | | 31,900 | | 19,461 | | 19,705 | |
| 2008/2009 Principal Property Taxes Over Due | 0 | | 0 | | 11,568 | | 283 | | 12,251 | | 296 | | 309 | |
| Current Year Property Taxes | 0 | | 0 | | 234,643 | | 234,643 | | 469,686 | | 0 | | 0 | |
| Admin/Reclamation Claim Payments | 0 | | 0 | | 245,620 | | 0 | | 245,620 | | 0 | | 0 | |
| **Net Free Cash Flow** | 188,721 | 10.63% | 251,248 | 13.36% | 39,903 | 0.63% | (27,661) | -0.49% | 643,781 | 2.87% | 140,476 | 2.47% | 58,647 | 1.07% |
| | | | | | | | | | | | | | | |
| **Cumulative Net Free Cash Flow** | 819,169 | | 1,070,417 | | 1,109,320 | | 1,081,659 | | | | 1,222,135 | | 1,280,782 | |
| | | | | | | | | | | | | | | |
| *EBITDA* | 53,170 | 2.99% | 81,985 | 4.36% | 435,307 | 7.61% | 445,020 | 8.36% | 1,098,810 | 4.91% | 458,751 | 8.06% | 378,474 | 6.67% |

*Memo - Beginning cash balance as of 8/31/10 $630,448

# Exhibit D

**Hudson's Furniture Showroom, Inc. - Forecast**

| | Q3 FY 2012 | % | Q4 FY 2012 | % | Total FYE 2012 | % | Annual FYE 2013 | % | Annual FYE 2014 | % | Annual FYE 2015 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 61.41% | | 61.41% | | 61.41% | | 61.41% | | 61.41% | | 61.41% |
| **Revenue:** | | | | | | | | | | | | |
| Total Sales | 6,128,732 | 100.00% | 5,517,547 | 100.00% | 22,819,129 | 100.00% | 23,488,877 | 100.00% | 24,154,404 | 100.00% | 24,840,102 | 100.00% |
| **Cost of Sales** | | | | | | | | | | | | |
| Inventory Purchases | 3,408,453 | 55.61% | 3,073,451 | 55.70% | 12,704,300 | 55.67% | 13,071,280 | 55.65% | 13,436,164 | 54.81% | 13,811,996 | 54.81% |
| Other Cost of Goods Sold | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Vendor Rebates | (77,742) | -1.27% | (69,864) | -1.27% | (289,271) | -1.27% | (297,792) | -1.27% | (306,328) | -1.27% | (315,093) | -1.27% |
| Total Cost of Sales | 3,330,712 | 54.35% | 3,003,554 | 54.44% | 12,415,099 | 54.41% | 12,773,488 | 54.38% | 13,129,830 | 54.35% | 13,496,883 | 54.33% |
| **Gross profit** | 2,798,039 | 45.65% | 2,513,993 | 45.56% | 10,404,030 | 45.59% | 10,715,190 | 45.62% | 11,024,573 | 45.64% | 11,343,239 | 45.67% |
| **Operating Expenses:** | | | | | | | | | | | | |
| Advertising | 357,000 | 5.83% | 319,000 | 5.78% | 1,323,000 | 5.80% | 1,497,452 | 6.38% | 1,540,819 | 6.38% | 1,585,486 | 6.38% |
| Auto Expense | 113,925 | 1.86% | 113,925 | 2.06% | 454,500 | 1.99% | 459,045 | 1.95% | 463,635 | 1.92% | 468,272 | 1.88% |
| Bad Debts/Recovery | 12,120 | 0.20% | 12,120 | 0.22% | 48,480 | 0.21% | 48,965 | 0.21% | 49,949 | 0.20% | 49,949 | 0.20% |
| Bank and C.C. charges | 110,583 | 1.80% | 99,133 | 1.80% | 410,538 | 1.80% | 423,059 | 1.80% | 435,589 | 1.80% | 448,483 | 1.81% |
| Contract Services | 6,060 | 0.10% | 6,060 | 0.11% | 24,240 | 0.11% | 26,864 | 0.11% | 26,361 | 0.11% | 27,200 | 0.11% |
| Contract Labor - Delivery | 75,750 | 1.24% | 75,750 | 1.37% | 303,000 | 1.33% | 306,030 | 1.30% | 309,090 | 1.28% | 312,181 | 1.26% |
| Contributions/Donations | 758 | 0.01% | 758 | 0.01% | 3,030 | 0.01% | 3,060 | 0.01% | 3,091 | 0.01% | 3,122 | 0.01% |
| Computer Expense | 18,180 | 0.30% | 18,180 | 0.33% | 72,720 | 0.32% | 73,447 | 0.31% | 74,182 | 0.31% | 74,923 | 0.30% |
| Depreciation & Amortization | 205,577 | 3.36% | 205,577 | 3.73% | 823,306 | 3.61% | 823,306 | 3.51% | 823,308 | 3.41% | 823,308 | 3.31% |
| Dues, Fees & Subscript. | 1,515 | 0.02% | 1,515 | 0.03% | 6,060 | 0.03% | 6,121 | 0.03% | 6,182 | 0.03% | 6,244 | 0.03% |
| Entertainment | 7,575 | 0.12% | 7,575 | 0.14% | 30,300 | 0.13% | 30,603 | 0.13% | 30,909 | 0.13% | 31,218 | 0.13% |
| Equipment Maintenance | 1,515 | 0.02% | 1,515 | 0.03% | 6,060 | 0.03% | 6,121 | 0.03% | 6,182 | 0.03% | 6,244 | 0.03% |
| Equipment Rental | 24,240 | 0.40% | 24,240 | 0.44% | 96,980 | 0.42% | 97,930 | 0.42% | 98,980 | 0.41% | 99,980 | 0.40% |
| Insurance - Auto | 19,695 | 0.32% | 19,695 | 0.36% | 78,780 | 0.35% | 79,568 | 0.34% | 80,363 | 0.33% | 81,167 | 0.33% |
| Insur-Gen/Worker's Comp. | 81,810 | 1.33% | 81,810 | 1.48% | 327,240 | 1.43% | 330,512 | 1.41% | 333,818 | 1.38% | 337,156 | 1.36% |
| Insurance - Health & Life | 66,408 | 1.08% | 66,408 | 1.20% | 265,632 | 1.16% | 268,288 | 1.14% | 289,304 | 1.11% | 271,997 | 1.09% |
| Miscellaneous expense | 15,150 | 0.25% | 15,150 | 0.27% | 60,600 | 0.27% | 61,206 | 0.26% | 61,818 | 0.26% | 62,436 | 0.25% |
| Office Expense | 25,452 | 0.42% | 25,452 | 0.46% | 101,808 | 0.45% | 102,602 | 0.44% | 103,830 | 0.43% | 104,888 | 0.42% |
| Outside Commision/Consult | 6,486 | 0.11% | 6,486 | 0.12% | 25,956 | 0.11% | 25,956 | 0.11% | 26,216 | 0.11% | 26,478 | 0.11% |
| Payroll Expense/Taxes | 1,308,605 | 21.35% | 1,243,414 | 22.54% | 5,053,339 | 22.15% | 5,114,433 | 21.77% | 5,165,460 | 21.47% | 5,258,597 | 21.17% |
| Permits and Licenses | 1,515 | 0.02% | 1,515 | 0.03% | 6,060 | 0.03% | 6,121 | 0.03% | 6,182 | 0.03% | 6,244 | 0.03% |
| Promotion and Gifts | 2,273 | 0.04% | 2,273 | 0.04% | 9,090 | 0.04% | 9,181 | 0.04% | 9,279 | 0.04% | 9,372 | 0.04% |
| Professional Fees | 60,600 | 0.99% | 60,600 | 1.10% | 242,400 | 1.06% | 244,824 | 1.04% | 247,272 | 1.02% | 249,745 | 1.01% |
| Property Taxes | 107,985 | 1.76% | 103,267 | 1.87% | 446,095 | 1.95% | 414,572 | 1.76% | 418,358 | 1.73% | 422,182 | 1.70% |
| Rent | 234,740 | 3.83% | 234,740 | 4.25% | 938,960 | 4.11% | 938,960 | 4.00% | 938,960 | 3.89% | 938,960 | 3.78% |
| Service Expense | | | | | | | 818 | 0.00% | | | | |
| Repairs & Maintenance | 65,145 | 1.06% | 65,145 | 1.18% | 260,580 | 1.14% | 263,186 | 1.12% | 265,818 | 1.10% | 268,476 | 1.08% |
| Lawn Care/Landscaping | 22,725 | 0.37% | 22,725 | 0.41% | 90,900 | 0.40% | 91,809 | 0.39% | 92,727 | 0.38% | 93,654 | 0.38% |
| Restructuring Costs | 20,907 | 0.34% | 20,907 | 0.38% | 83,628 | 0.37% | 84,464 | 0.36% | 85,309 | 0.35% | 86,162 | 0.35% |
| Security | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Showroom Supplies | 1,515 | 0.02% | 1,515 | 0.03% | 6,060 | 0.03% | 6,121 | 0.03% | 6,182 | 0.03% | 6,244 | 0.03% |
| Taxes & Licenses | 13,635 | 0.22% | 13,635 | 0.25% | 54,540 | 0.24% | 55,085 | 0.23% | 55,636 | 0.23% | 56,193 | 0.23% |
| Telephone | 1,515 | 0.02% | 1,515 | 0.03% | 6,060 | 0.03% | 6,121 | 0.03% | 6,182 | 0.03% | 6,244 | 0.03% |
| Travel | 31,058 | 0.51% | 31,058 | 0.56% | 124,230 | 0.54% | 125,454 | 0.53% | 126,709 | 0.52% | 127,976 | 0.52% |
| Uniforms | 12,120 | 0.20% | 12,120 | 0.22% | 48,480 | 0.21% | 48,965 | 0.21% | 49,454 | 0.20% | 49,949 | 0.20% |
| Utilities | 152 | 0.00% | 152 | 0.00% | 606 | 0.00% | 618 | 0.00% | | | | |
| Warehouse Supplies | 156,919 | 2.56% | 156,919 | 2.84% | 627,674 | 2.75% | 633,957 | 2.70% | 640,296 | 2.65% | 646,699 | 2.60% |
| Minus OH Allocated to US Bank Stores | 6,060 | 0.10% | 6,060 | 0.11% | 24,240 | 0.11% | 24,482 | 0.10% | 24,727 | 0.10% | 24,974 | 0.10% |
| **Total Operating Expenses** | 2,435,332 | -12.42% | 2,335,147 | -13.49% | 9,463,894 | -13.49% | 9,664,832 | -13.13% | 9,806,801 | -12.87% | 9,852,168 | -12.57% |
| | | 39.75% | | 42.32% | | 41.47% | | 41.15% | | 40.60% | | 40.00% |
| **Other Income (Expenses):** | | | | | | | | | | | | |
| Miscellaneous Income | 51,051 | 0.83% | 51,051 | 0.93% | 204,205 | 0.89% | 204,205 | 0.87% | 208,247 | 0.85% | 208,309 | 0.84% |
| Finance Co. Usage Charge | (43,945) | -0.70% | (39,521) | -0.70% | (160,304) | -0.70% | (165,000) | -0.70% | (169,665) | -0.70% | (173,645) | -0.70% |
| Interest Expense | (291,915) | -4.76% | (291,947) | -5.57% | (1,167,644) | -5.13% | (1,151,160) | -4.90% | (1,074,638) | -4.68% | (1,158,348) | -4.65% |
| Total Other Income (Expense) | (284,809) | -4.63% | (280,417) | -5.05% | (1,123,743) | -4.94% | (1,111,955) | -4.73% | (1,036,056) | -4.32% | (1,123,684) | -4.52% |
| Excess (Deficit) of Revenue over Expenses before Income Tax | 77,663 | 1.27% | (99,523) | -1.80% | (196,006) | -1.80% | (61,597) | -0.26% | 124,532 | 0.52% | 316,839 | 1.28% |
| Income Tax Expense (Refund) | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 69,414 | 0.29% | 135,691 | 0.54% |
| Excess (Deficit) of Revenue over Expenses | 77,663 | 1.27% | (99,523) | -1.80% | (196,006) | -1.80% | (61,597) | -0.26% | 55,118 | 0.23% | 181,748 | 0.73% |
| **Non Cash Expenses** | | | | | | | | | | | | |
| Property Tax Accrual | 107,985 | | 103,267 | | 446,095 | | 414,572 | | 418,358 | | 422,182 | |
| Depreciation/Amortization | 205,977 | | 209,723 | | 823,908 | | 823,908 | | 823,908 | | 823,908 | |
| Cash Flow From Operations | 391,615 | 6.39% | 209,723 | 3.80% | 1,083,013 | 4.75% | 1,177,574 | 5.01% | 1,287,384 | 5.37% | 1,427,638 | 5.75% |
| Change in Net Working Capital - A/R | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Working Capital - Inventory Adjustment | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Change in Capex | 46,054 | | 48,054 | | 184,215 | | 184,215 | | 184,215 | | 184,215 | |
| Distributions | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |

Hudson's Furniture Showroom, Inc. - Forecast

# Exhibit D

| | Q3 FY2012 | 61.41% % | Q4 FY2012 | 61.41% % | Total FYE 2011/2012 | 61.41% % | Annual FYE 2012/2013 | 61.41% % | Annual FYE 2013/2014 | 61.41% % | Annual FYE 2014/2015 | 61.41% % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | |
| Free Cash Flow for Debt Payment | 346,561 | 5.64% | 163,689 | 2.97% | 899,697 | 3.94% | 993,359 | 4.23% | 1,113,169 | 4.61% | 1,249,622 | 5.01% |
| **Additional Cash Outlays** | | | | | | | | | | | | |
| Principal Loan/Lease Payments exc "rent" | 34,511 | | 34,511 | | 138,044 | | 138,044 | | 138,044 | | 138,044 | |
| Principal on restructured real estate debt (incl F | 42,000 | | 42,490 | | 167,042 | | 174,979 | | 183,287 | | 191,625 | |
| Principal on restructured FBI debt | 19,952 | | 20,203 | | 79,321 | | 83,379 | | 87,645 | | 92,129 | |
| 2008/2009 Principal Property Taxes Over Due | 323 | | 338 | | 1,266 | | 1,514 | | 1,810 | | 2,164 | |
| Current Year Property Taxes | 446,095 | | 0 | | 446,095 | | 414,572 | | 418,358 | | 422,182 | |
| Admin/Reclamation Claim Payments | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Net Free Cash Flow | 197,281 | -3.22% | 66,127 | 1.20% | 67,929 | 0.30% | 180,671 | 0.77% | 284,015 | 1.18% | 397,479 | 1.60% |
| | | | | | | | | | | | | |
| **Cummulative Net Free Cash Flow** | 1,083,461 | | 1,149,588 | | | | 1,330,459 | | 1,614,474 | | 2,011,953 | |
| | | | | | | | | | | | | |
| *EBITDA* | 575,576 | 9.39% | 327,175 | 7.20% | 1,847,956 | 7.52% | 1,913,319 | 6.15% | 2,098,471 | 6.22% | 2,112,149 | 3.51% |

## LIQUIDATION ANALYSIS

| ASSETS/PROCEEDS | ESTIMATED LIQUIDATION VALUE<br>As of 8/31/2010 |
|---|---|
| Cash | $760,000 |
| Accounts Receivable[1] | $360,000 |
| Inventory[2] | $3,000,000 |
| Real Property[3] | |
|     Wachovia | $19,000,000 |
|     Compass Bank | $4,500,000 |
|     Florida Capital | $3,720,000 |
|     GE Commercial Finance | $3,230,000 |
|     Regions Bank | $6,000,000 |
|     **TOTAL LIQUIDATION VALUE** | $40,570,000 |
| Secured Claims | |
|     Wachovia | $24,000,000 |
|     Compass Bank | $3,100,000 |
|     Florida Capital | $4,200,000 |
|     GE Commercial Finance | $3,900,000 |
|     Regions Bank | $400,000 |
|     7976 Properties, Inc. | $420,000 |
|     Furniture Brands International – Broyhill | $1,800,000 |
|     La-Z-Boy | $60,000 |
|     Valley Commercial Capital | $1,900,000 |
| Secured Tax Claims | $850,000 |
| Priority Tax Claims | $50,000 |
| Administrative Claims: Chapter 7[4] | $1500 |
| Administrative Claims: Chapter 11 | $200,000 |
| **TOTAL** | $51,881,500 |
| **AVAILABLE FOR GENERAL UNSECURED CREDITORS** | 0.00 |

## EXHIBIT "E"

[1] Assumes 50% of Book Values.
[2] Assumes 30% of Book Values.
[3] Based on recent appraisals.
[4] Assumes no Asset Case.